# ATTACHMENT B

**In The Matter Of:**

*Todd, et al v.*
*Carstarphen, et al*

---

*Rodney Harleston*
*December 6, 2016*

---

*D'Amico Gershwin, Inc.*
*Court Reporters & Videoconferencing*
*11475 West Rd, Roswell, GA 30075*
*(770) 645-6111 or toll-free (888) 355-6111*



Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAFFANIE TODD on behalf of          )
herself; R.D., R.D., and            )   CIVIL ACTION FILE
D.T., by and through their          )
next friend, DAFFANIE               )   NO. 1-16-cv-3729-WSD
TODD,                               )
                                    )
          Plaintiffs,               )
                                    )
vs.                                 )
                                    )
MERIA CARSTARPHEN, in her           )
official capacity as                )
SUPERINTENDENT, ATLANTA             )
INDEPENDENT SCHOOL                   )
SYSTEM,                             )
                                    )
          Defendants.               )
_____)

          Deposition of RODNEY HARLESTON, taken
     on behalf of the Plaintiffs, pursuant to the
     stipulations contained herein, reading and
     signing of the deposition being reserved, in
     accordance with the Federal Rules of Civil
     Procedure, before Charna S. Perloe,
     Certified Court Reporter and Notary Public,
     at 130 Trinity Avenue, SW, Atlanta, Georgia,
     on the 6th day of December 2016, commencing
     at the hour of 1:38 p.m.

          D'AMICO GERSHWIN, INC.
     Court Reporters & Videoconferencing
          11475 West Road
          Roswell, GA  30075
          (770) 645-6111
          www.AtlantaCourtReporter.com

1

1                    INDEX TO EXAMINATIONS

2      Examination                                      Page

3      By Mr. Flack                                       9

4                             - - -

5

6

7                        INDEX TO EXHIBITS

8

9      Exhibit                Description              Page

10
           P-I       11/11/16 email from Mr. Harleston to
11                   Ms. Ponder                          11

12         P-J       Contact Log, 8/5/16-12/6/16         17

13         P-K       Contact Log, 8/5/16-12/6/16         18

14         P-L       Fulton County Juvenile Court
                     Compulsory School Attendance
15                   Referral, September 7, 2016         19

16         P-M       Fulton County Juvenile Court
                     Compulsory School Attendance
17                   Referral, September 7, 2016         20

18         P-N       Handwritten document, 4 pages       48

19         P-O       Contact Log, 8/1/16-11/8/16         51

20         P-P       Letter from Attendance Committee,
                     Continental Colony Elementary School
21                   to Parent/Guardian, 8/25/16         57

22

23

24

25
                                                          2

1                    REPORTER DISCLOSURE OF NO CONTRACT

2

3              I, Charna S. Perloe, Certified Court
         Reporter, do hereby disclose pursuant to Article
4        10.B of the Rules and Regulations of the Board of
         Court Reporting of the Judicial Council of
5        Georgia that I am a Georgia Certified Court
         Reporter.  D'Amico Gershwin/I was contacted by
6        the party taking the deposition to provide court
         reporting services for this deposition; D'Amico
7        Gershwin/I will not be taking this deposition
         under any contract that is prohibited by O.C.G.A.
8        15-14-37(a) and (b) or Article 7C of the Board;
         and I am not disqualified for a relationship of
9        interest under the provisions of O.C.G.A.
         9-11-28(c).
10             There is no contract to provide reporting
         services between myself or any person with whom I
11       have a principal and agency relationship nor any
         attorney at law in this action, party to this
12       action, party having a financial interest in this
         action, or agent for an attorney at law in this
13       action, party to this action, or party having a
         financial interest in this action.  Any and all
14       financial arrangements beyond my/D'Amico
         Gershwin's usual and customary rates have been
15       disclosed and offered to all parties.
               This, the 16th day of December, 2016.

16

17

18

19       _____
         CHARNA PERLOE, CCR-A-457
20

21

22

23

24

25
                                                          3

1                    FIRM DISCLOSURE OF NO CONTRACT

2

3          I, Kelly D'Amico, do hereby disclose
      pursuant to Article 10.B of the Rules and
4     Regulations of the Board of Court Reporting
      of the Judicial Council of Georgia that
5     D'Amico Gershwin, Inc., was contacted by
      the taking attorney to provide court
6     reporting services for this deposition and
      there is no disclosed contract that is
7     prohibited by O.C.G.A. 15-14-37(a) and (b)
      or Article 7C of the Rules and Regulations
8     of the Board for the taking of this
      deposition.
9          There is no contract to provide
      reporting services between D'Amico
10    Gershwin, Inc., or any person with whom
      D'Amico Gershwin, Inc., has a principal and
11    agency relationship nor any attorney at law
      in this action, party to this action, party
12    having a financial interest in this action,
      or agent for an attorney at law in this
13    action, party to this action, or party
      having a financial interest in this action.
14    Any and all financial arrangements beyond
      D'Amico Gershwin's usual and customary
15    rates have been disclosed and offered to
      all parties.
16         This, the 16th day of December, 2016.

17

18

19

20

21                    KELLY D'AMICO, CEO
22                    D'AMICO GERSHWIN, INC.

23

24

25
                                                    4

```
 1                    A P P E A R A N C E S

 2

 3     On behalf of the Plaintiffs:

 4         KIMBERLY D. CHARLES, ESQ.
           JONATHAN D. FLACK, ESQ.
 5         Atlanta Legal Aid Society, Inc.
           777 Cleveland Avenue, SW
 6         Suite 410
           Atlanta, Georgia 30315
 7         Tel: (678) 702-8404
           E-Mail:  Kdcharles@atlantalegalaid.org
 8                   Jflack@atlantalegalaid.org

 9
           CRAIG L. GOODMARK, ESQ.
10         Atlanta Legal Aid Society, Inc.
           54 Ellis Street, NW
11         Atlanta, Georgia 30303
           Tel:  (404) 719-4848
12         Email:  Cgoodmark@gmail.com

13

14     On behalf of the Defendants:

15         LAURANCE WARCO, ESQ.
           Nelson, Mullins, Riley & Scarborough, LLP
16         201 17th Street
           Suite 1700
17         Atlanta, Georgia 30363
           Tel: (404) 322-6177
18         Email:  Laurance.warco@nelsonmullins.com

19

20     Also Present:

21         John Gainey

22

23

24

25
```

Rodney Harleston - December 6, 2016

1        MR. FLACK:  This is the deposition of

2     Rodney Harleston in the matter of Todd,

3     et al., versus Carstarphen, et al., Civil

4     Case No. 1-16-CV-03729-WSD, filed in the

5     Northern District of Georgia.

6        This deposition is taken pursuant to

7     notice and agreement of counsel for all

8     purposes permitted by law.  It is governed

9     by the Federal Rules of Civil Procedure.

10        Does counsel for Mr. Harleston have

11     any objection to the qualification of the

12     officer taking the deposition or to the

13     manner of taking it or to the notice of

14     taking said deposition or as to the time

15     and place thereof?

16        MR. WARCO:  I do not.

17        MR. FLACK:  All objections except as

18     to form of the question and responsiveness

19     of the answer or privilege are hereby

20     reserved.  Is that acceptable?

21        MR. WARCO:  Sure.

22        MR. FLACK:  Mr. Warco, will the

23     witness read and sign?

24        MR. WARCO:  Yes.

25        MS. CHARLES:  We need to talk about

6

```
1        that after.
2               MR. FLACK:  The time is 1:39 p.m., and
3        The date is Tuesday, December 6, 2016.
4               In addition to myself and
5        Mr. Harleston, the following individuals
6        are present in the room:  Craig Goodmark,
7        co-counsel for Plaintiff, Kimberly Charles,
8        co-counsel for Plaintiff, John Gainey, a
9        law student intern with Atlanta Legal Aid,
10       Mr. Laurance Warco, attorney for
11       Defendants, and the court reporter.
12              Mr. Harleston, my name is Jonathan
13       Flack.  I'm an attorney with the Atlanta
14       Legal Aid Society, and I represent
15       Ms. Daffanie Todd and her three children,
16       the plaintiffs in this lawsuit.
17              I'm going to ask you a series of
18       questions today relating to your work with
19       Atlanta Independent School System or
20       Atlanta Public Schools.  I'll refer to the
21       defendants by their common name, Atlanta
22       Public Schools or APS, and you can do the
23       same.
24              If at any time you do not hear or
25       understand my questions, please tell me.
```

7

Rodney Harleston - December 6, 2016

1        It is important that you speak slowly and
2    audibly so that the court reporter can
3    transcribe your complete answers.
4            Do you understand that?
5            THE WITNESS:  I do.
6            MR. FLACK:  I also ask that you answer
7    verbally as opposed to nodding or gesturing
8    because the court reporter can only
9    transcribe verbal responses.
10           Finally, I ask that you let me finish
11   my entire question before you answer in
12   order to ensure a complete transcript.  If
13   at any time you would like to take a break,
14   Mr. Harleston, I'm happy to accommodate
15   you.  I only ask that if a question is
16   pending, I request that you answer that
17   question before we take the break.
18           Is there anything -- actually,
19   Mr. Warco, do you have any objections to
20   the court reporter swearing in the witness?
21           MR. WARCO:  I do not.
22                   RODNEY HARLESTON,
23   having been first duly sworn, was examined and testified
24   as follows:
25   ///

8

Rodney Harleston - December 6, 2016

```
 1                    EXAMINATION
 2   BY MR. FLACK:
 3       Q    All right.  Mr. Harleston, thank you for
 4   coming today.
 5       A    Okay.
 6       Q    Is there anything that would prevent you from
 7   testifying truthfully to my questions today?
 8       A    No.  There is not.
 9       Q    Is there anything that would prevent you from
10   testifying accurately to my questions today?
11       A    No.
12       Q    Have you ever been deposed before today?
13       A    No, I haven't.
14       Q    Are you aware that Ms. Todd is claiming in
15   this lawsuit that she's entitled to a reasonable
16   accommodation for her blindness?
17       A    I am.
18       Q    Have you spoken with an attorney in
19   preparation for this deposition?
20       A    No, I haven't.
21       Q    Did you speak with anyone else in preparation
22   for this deposition?
23       A    Maybe I didn't understand the question.  I did
24   talk to Mr. Warco before I came in.  Okay.
25       Q    Okay.
```

9

Rodney Harleston - December 6, 2016

1      A    Okay.

2      Q    So you spoke with Mr. Warco?

3      A    Right.  I'm sorry.  I did.

4      Q    It's fine.  Please make corrections, if you

5  can think of them.

6      A    Okay.

7      Q    But it sounds like Mr. Warco is the only

8  person you spoke to; is that right?

9      A    It is.

10      Q    Did you look at any documents in preparation

11  for today's deposition?

12      A    Just the documents I was trying to get ready

13  for you to bring.

14      Q    Thank you.

15           In a minute -- well, so you brought documents.

16  Can I see the documents you brought in relation to the

17  subpoena?

18           MR. WARCO:  (Presents.)

19           MR. FLACK:  Thank you.

20  BY MR. FLACK:

21      Q    Can you tell us what these documents are?

22      A    Well, I was trying to find everything I had,

23  you know, pertaining to the case.  The first document

24  that he had taken off, that was just when I had gotten

25  a call from --

                                                    10

Rodney Harleston - December 6, 2016

```
 1       Q     I'm going to interrupt you.  I'm sorry.
 2             MR. GOODMARK:  Go off the record real
 3       quick.
 4             (A discussion ensued off the record.)
 5             (Recess from 1:44 p.m. to 1:49 p.m.)
 6             (Exhibit P-I was marked.)
 7   BY MR. FLACK:
 8       Q     So I'm just going to take a minute,
 9   Mr. Harleston, to identify these documents, and then
10   we'll add them to the record.
11       A     Okay.
12       Q     So the document I'm handing you is marked as
13   Exhibit I.  Can you identify this document?
14       A     This is an email that I sent to -- I think
15   it's the supervisor of transportation for my cluster.
16   I sent it after I talked to Mr. Dennison the first time
17   he was requesting transportation, and so I sent an
18   email to Ms. Chandra Ponder.
19       Q     Okay.  And so Ms. Chandra Ponder or Shandra
20   Ponder, that's the supervisor of transportation for the
21   cluster?
22       A     For my cluster.
23       Q     Of Continental Colony?
24       A     Yeah.
25       Q     Who is Kristen Vaughn?
```

11

Rodney Harleston - December 6, 2016

1    A    Kristen Vaughn is the principal of Continental

2  Colony.

3    Q    Otherwise known as Dr. Vaughn, right?

4    A    Yes.

5    Q    Okay.  And you said you sent this just after

6  you talked to Mr. Dennison.  Do you remember when that

7  conversation was in reference to this email?

8    A    I think it was probably the same day.  He

9  called and was explaining the situation to me, and I

10  told him that I didn't really have anything to do with

11  transportation, but I would, you know, find out who I

12  needed to talk to and get in touch with him.  So that's

13  when I did the email.

14    Q    Okay.  So you're saying that the first time

15  you talked to Mr. Dennison was on August 11th?

16    A    Yes.

17    Q    And had you talked with Ms. Todd prior to

18  that?

19    A    No, I hadn't.

20    Q    Had you heard of the situation with Ms. Todd

21  and Mr. Dennison prior to that?

22    A    No, I hadn't.

23    Q    Okay.  So the first time you learned about

24  this was when you spoke with Mr. Dennison on August

25  11th?

12

Rodney Harleston - December 6, 2016

1     A     Yeah.

2     Q     Okay.  Do you know what action was taken after

3   this email?

4     A     I'm trying to remember -- I do remember him

5   getting back in touch with me, and I did talk with

6   Ms. Todd also because Ms. Ponder, I think, talked

7   directly to him.  I didn't talk to her.  I didn't know

8   what the big deal at first, and so I left -- I just did

9   the email for her to get in touch with him so that she

10  could explain, you know, the reason they could provide

11  the transportation or the reason they could not.

12    Q     Okay.  So you are saying you think Ms. Ponder

13  spoke with Mr. Dennison sometime after this email?

14    A     I think so.

15    Q     And it sounded like you also said you had

16  another conversation with Mr. Dennison after this

17  email; is that right?

18    A     Yeah.  I had a couple of conversations.

19    Q     I think we'll put this aside for now and move

20  on to the next document you brought.  Thank you.

21          So the next document is marked as Exhibit J.

22          What is this document, Mr. Harleston?

23    A     Well, this is just some documentation that I

24  made for R.E.D.  It's just some of the things I put in

25  the contact log.  This contact log was shorter than her

                                                          13

1    brother's.  The siblings, I kind of put them all at one

2    time.  I just decided to put a few in.  A lot of times,

3    it was the oldest one.

4          This document lists some of the contact I had,

5    conversations that I had and also different discussion

6    with the school social worker enforcing the Georgia

7    Compulsory School Attendance law.  It just has the

8    letters and dates that I mailed to the parents about

9    the law and unexcused absence.

10   Q    Okay.  How are these contact logs generated?

11   A    We have what we call Infinite Campus.  It's a

12   computer system that the Atlanta Public Schools uses

13   for everything from the grades to discipline to

14   communication and everything, and you can document

15   whatever you need to do in the contact log.  So when I

16   got ready to come here, I jut printed out my

17   conversation.

18   Q    So is it possible there were other entries

19   besides these four that you had related to R.E.D. that

20   are not on Exhibit J?

21   A    I didn't understand.

22   Q    I'm sorry.  I'll repeat.

23         So is it possible -- are these the only

24   entries of contact within Infinite Campus with regard

25   to R.E.D.?

                                                        14

Rodney Harleston - December 6, 2016

1       A     That I did, yes.

2       Q     So it doesn't list other people that had

3    contacts with R.E.D.?

4       A     No.  I printed out my conversation.  Like, I

5    put my name and printed everything that I did.  I put

6    in.

7       Q     So did you mail a third warning to Ms. Todd?

8       A     No.  Actually, I didn't.  I have that letter

9    with me.  Here is the letter.  I didn't even open it.

10      Q     Okay.  Why did you not mail that letter?

11      A     Well, I was told not to because legal was

12   handling it.

13      Q     Who told you that?

14      A     My coordinator, Dr. Jacquelyn Anthony.

15      Q     Sorry.  Jack Wan?

16      A     Jacquelyn Anthony.

17      Q     Do you know about when -- do you know about

18   what date you were going to send that letter?

19      A     September 8th.  September 8th.

20      Q     So you were going to file the third attendance

21   letter on September 8th?

22      A     I was going to mail the third attendance

23   letter, and I was going to file my CHINS.  It's CHINS,

24   Children in Need of Service.  C-H-I-N-S is the acronym,

25   sort of like not a petition, but they changed it.  It's

15

Rodney Harleston - December 6, 2016

1  sort of like a petition.  We have to go to court.

2      Q    And we'll explain further when I turn to that.

3      A    Okay.

4      Q    But, yeah.

5           MR. FLACK:  Just going off the record

6      for a second.

7           (A discussion ensued off the record.)

8  BY MR. FLACK:

9      Q    So do you know which -- around what date

10  Ms. Anthony instructed you not to mail that letter?

11     A    It was on September 8th, 2016.

12     Q    Okay.  So on that day, was she aware that you

13  filed the CHINS petition?

14          MR. WARCO:  Objection and foundation.

15          THE WITNESS:  I beg your pardon?

16          MR. WARCO:  You can answer.

17     A    (By the Witness)  I didn't file the CHINS.  My

18  plan was I had just completed my package with the

19  CHINS.  I had my letter that I had to send to the

20  parents.  We have to send a letter also, and then I

21  called to let her know what I was doing, and she asked

22  me not to do it.  So that's why I didn't do it.

23     Q    I understand.

24          So is it right that Ms. Anthony instructed you

25  essentially not to mail the third attendance letter,

16

1    not to mail the notice and not to mail the CHINS

2    petition?

3         A    It was not to do the CHINS petition because

4    the letter, it was no use sending, since I wasn't going

5    to do it.

6         Q    I understand.  Was that the first time someone

7    from legal had given you an instruction?

8         A    She's not from legal.  Oh, I guess she -- that

9    was the first time.

10         Q    Okay.  For now we'll put Exhibit J aside.

11         A    (Presents.)

12         Q    Thank you.

13              So moving to Exhibit -- the next exhibit.  So

14    moving to this other document that you gave me.

15              MR. FLACK:  We're going off the record

16         for a second.

17              (A discussion ensued off the record.)

18              (Exhibit P-J was marked.)

19    BY MR. FLACK:

20         Q    Actually, before I move on, page 3 of Exhibit

21    J -- I can just show it to you -- it's a letter dated

22    September 8.  That's the letter that you did not send?

23         A    Yes, it is.

24         Q    And can you just identify that letter in terms

25    of what it --

                                                        17

Rodney Harleston - December 6, 2016

1      A      That is what we call the third letter.   The

2   first letter described the law.   The second letter is a

3   little more to it about the attendance law, and the

4   third law -- the third letter is when we let the parent

5   know that we are filing in juvenile court.

6      Q      Thank you.

7              (Exhibit P-K was marked.)

8   BY MR. FLACK:

9      Q      Moving on to the next document you gave us,

10  which is Exhibit K, can you identify -- do you agree

11  that these four pages are substantially the same with

12  the exception that it's for a different child?

13     A      Yes, it is.   And it may be more information in

14  the contact log.   Normally, I would do it with the

15  oldest child, but it is one mistake I made on the

16  contact log.   I did note it in there, and that was on

17  September 27th.

18              On September 27th, when it says "home visit,"

19  that wasn't pertaining to the Dennison children, and

20  when I saw that -- I was looking through my notes -- I

21  did add that little sentence at the bottom.

22     Q      Thank you.

23              So just to clarify, you're saying the final

24  entry dated 9/27 on Exhibit K in effect should be

25  scratched because it has no relation to this case or

                                                          18

1    Dennison or Todd?

2         A    That's correct.

3         Q    Okay.  Putting that aside for now.

4              (Exhibit P-L was marked.)

5    BY MR. FLACK:

6         Q    So the next document you gave us I'm marking

7    as Exhibit L.  Can you just identify that document?

8         A    That's the CHINS referral that we're going to

9    do, give to the juvenile court for R.D.D.

10        Q    Okay.

11             MR. FLACK:  Going off the record for

12        one second.

13             (A discussion ensued off the record.)

14             MR. FLACK:  The parties have agreed in

15        order to ensure the confidentiality of the

16        children's names here, we'll refer to the

17        eldest Dennison child as R.E.D., her first

18        name R.E.D.  Her middle initial is E.  So

19        the court reporter later will redact it and

20        substitute "R.E.D." for R.E.D.

21             And with regard to the 8-year-old

22        child, R.D.D., later the court reporter

23        will redact as "R.D.D.," because his middle

24        initial is D.

25             And to the extent there's discussion

                                                    19

```
 1          about the youngest child, the 5-year-old,
 2          D.T., the court reporter can redact her
 3          name as "D.T."
 4     BY MR. FLACK:
 5          Q    So is it correct that you've -- can you
 6     identify this document?
 7          A    Yes.  This is referral for juvenile court for
 8     CHINS, Children in Need of Service, and it -- you have
 9     to complete this.  This lists the steps that the
10     school -- you're talking about the fact that the parent
11     did violate the attendance law and the steps that the
12     school did to try to get the children to come to school
13     and just data that they need at the court, a copy of
14     attendance records.
15          Q    And which child is this for?
16          A    This is for R.D.D.
17          Q    Great.  Thank you.
18               So we'll move on to the next document you
19     showed me, which I'm marking as Exhibit M.
20               (Exhibit P-M was marked.)
21     BY MR. FLACK:
22          Q    Is this the same document with regard to
23     Re'niya?
24          A    Yes.  It's the same document.
25          Q    And these are the CHINS petition -- CHINS
```

20

Rodney Harleston - December 6, 2016

1    petitions referenced on the contact log with regard to

2    September 8 that you didn't file; is that correct?

3        A    You're correct.

4        Q    Okay.  So let's move on.  We might get back to

5    some of those documents later.

6             Mr. Harleston, did you see any media coverage

7    about this case?

8        A    I saw it a few times on the news, yes, I did.

9        Q    Was that TV news?

10       A    TV news.

11       Q    Did you see any court documents related to

12   this case?

13       A    No, I haven't.

14       Q    All right.  Now I'm going to ask you a

15   couple -- some questions about your educational and

16   professional background to get a sense of your prior

17   work experience.

18            Where did you go to high school?

19       A    I went to high school at Jeff Davis High

20   School in Hazlehurst, Georgia.

21       Q    In what city?

22       A    Hazlehurst.

23       Q    Thank you.

24            And what year did you graduate?

25       A    1977.

21

1      Q     Where did you go to college?

2      A     I went to undergrad at Fort Valley State

3   College in Fort Valley, Georgia.

4      Q     What year did you graduate?

5      A     I think it was 1985.

6      Q     And then you later got additional education;

7   is that right?

8      A     Yes.  I got my master's in social work from

9   the University of Michigan in Ann Arbor, Michigan.

10     Q     How long have you been working in your current

11  job?

12     A     I think it's about 25 years.

13     Q     Wow, that's wonderful.

14           So your current job, can you state your title?

15     A     My title is school social worker.

16     Q     And you said earlier that you're the social

17  worker assigned to Therrell High School and Continental

18  Colony Elementary; is that right?

19     A     That's right.

20     Q     Has that been your job title essentially for

21  the last 25 years?

22     A     No.  That was for the last -- I think this is

23  my fourth year at those two schools.

24     Q     Okay.  So can you describe what you did five

25  years ago or prior to this job?

                                                    22

1       A     Five years ago I was doing positive behavior

2    intervention and support.  The acronym was PBIS.

3       Q     Pilot behavior?

4       A     Positive behavior -- PB -- positive behavior

5    intervention and support.

6       Q     Thank you.

7             Is PBIS substantially similar, though, to

8    being a social worker?  Can you explain how it's

9    different?

10      A     Not necessarily.  PBIS is -- it's called a

11   positive behavior -- positive approach to discipline.

12   It came out a few years ago, and it's supposed to cut

13   down on your suspension and your behavior.

14            What we do is you teach your kids in your

15   school how to act in every situation.  We train them on

16   the rules from the hallway to the bathroom to the

17   classroom so that they would know what the rules are

18   and what the expectations are in hope that they don't

19   break the rules.

20      Q     And how long were you in that job?

21      A     I did that for -- it was about three years,

22   about three years, yeah.

23            But going back, when you asked me about social

24   work, I was just taken out of the school for that

25   particular reason, to do that, but it didn't

23

Rodney Harleston - December 6, 2016

1   necessarily have to be a social worker that did it, but
2   they did ask us to do it.
3       Q    Okay.  And can you say when you graduated from
4   the University of Michigan?
5       A    I graduated the University of Michigan
6   December 1986.
7       Q    Okay.  So your 25-year statement that you've
8   been -- is that with APS that you've worked with for 25
9   years?
10      A    Yes, it is.
11      Q    Okay.  So what was your first job that you
12  were hired at with APS?
13      A    School social worker.  I've always been school
14  social worker.
15      Q    Okay.  So as a social worker, can you give me
16  a sense of your job duties?
17      A    One of my job duties, basically as it relates
18  to the Dennison children, was to enforce the Georgia
19  Compulsory School Attendance law.
20      Q    And you said it was to enforce that law; is
21  that right?
22      A    That's one of my jobs being a school social
23  worker.
24      Q    And continue, please.
25      A    And that job -- that law says that all

24

1    children under the age of -- all children age 6 to 15

2    must attend school.

3         Q    Does it say that parents must cause their

4    children to attend school?

5         A    Yes.  That is in the write-up.

6         Q    We'll talk about that statute more.

7              So tell me more about your other job duties.

8         A    One of my jobs is also to -- all DFACS cases,

9    the Department of Family and Children's Service cases,

10   any kind of abuse or any kind of neglect, the social

11   worker is in charge of filing that with the Department

12   of Family and Children's Services.

13             I do a lot with juvenile court.  I'm kind of

14   the one that juvenile court corresponds with about the

15   progress of their probationers.  They come to the

16   school to see them, come to the school to get reports

17   and things like that.

18             For Atlanta Public Schools, I'm over the

19   uniforms for elementary and middle school students.  We

20   do have an organization that helps us out with the

21   uniforms.  You asked about my job duties.

22        Q    Yeah, yeah.  This is all . . .

23        A    Okay.  So I'm over that for Atlanta Public

24   Schools, so the social worker, order uniforms through

25   me for the kids from elementary to middle school.  I

                                                    25

1    correspond with the Assistance League of Atlanta to get

2    their uniforms, one of my job duties.

3        Q    If I can, let me ask you about what you do

4    with regard to outreach to parents, if anything.

5        A    I get all referrals for any type services for

6    families from if there's a need for food and a need for

7    shelter, if there's a need for housing, if there's a

8    need.  Just any kind of social services things, it

9    comes to the school social worker.

10        Q    So if a parent is in need of some sort of

11    assistance with regard to their children's schooling,

12    that would be something that you and the other school

13    social workers assist with?

14        A    That would be one -- a call that we get.  It

15    may not be -- we may have to refer them out to

16    somewhere else, someone else in the system.  We would

17    probably get that call.

18        Q    And if the student or parent is having some

19    issue with transportation, is that also something that

20    could come into your office?

21        A    Yes.  I mean, we try to work -- whatever

22    barriers it is that causes the child not to come to

23    school, we or a social worker, one of our jobs is to

24    undo that barrier, if we can.

25        Q    Who are your supervisors?

26

Rodney Harleston - December 6, 2016

1       A     My supervisor, my direct supervisor,

2    coordinator of social work services, is Jacquelyn

3    Anthony.

4       Q     And does she work in the same building as you?

5       A     No.  She works here.

6       Q     Okay.  And what is her title?

7       A     She's coordinator of social work services.

8       Q     Thank you.  You had just said that.  But I

9    wasn't clear.

10      A     May I say something else about that?

11      Q     Of course.

12      A     Now, she is new.  This was going on, I think,

13   right before she got here.

14      Q     So when did she start?

15      A     She started, I can just about tell you, about

16   two or three days before we met with them.  It's in one

17   of my notes that we met with them.  She was probably

18   about three days or four days in, less than a week into

19   the job here.

20      Q     Are you referring to the meeting on August

21   16th?

22      A     Yes, yeah.  It sounds like that may have been

23   on Thursday.  She might have started that Monday.  It

24   wasn't long.  It was a few days.

25      Q     Okay.  Do you have any other supervisors?

27

1    A    I can't remember the title, the social

2    superintendent, but my -- her boss is Nicole Spiller.

3    Q    And what's Nicole Spiller's title or your

4    understanding of --

5    A    Yeah.  I think it's social -- I can't remember

6    the exact title.

7    Q    Would you say that she's the head of the

8    social services --

9    A    Yes.

10    Q    -- office downtown?

11    A    Yes.

12    Q    Okay.  And what's the relationship between

13    your office and the truancy center, which is headed up

14    by Urania Scott?

15    A    She is also a social worker.  She does a lot

16    with truancy throughout Atlanta with the APD when they

17    have students in the neighborhood and stores and

18    whatever like that.  They will call Urania and ask

19    Urania what school they're supposed to be in, kind of

20    figure out why that kid is not in school, and then we

21    try to figure out how to get that kid back into school.

22        As far as working with me, I get calls a lot

23    from citizens, police or whoever is saying that they

24    saw a kid and never enrolled in school or kids hang out

25    in my neighborhoods, in my cluster that I work or

28

1    hanging out certain places.  I would call Urania.  They

2    may do a truancy sweep there.

3              Just recently I called -- well, I was told

4    that there was a 14-year-old girl who wasn't in school

5    at all this year, and so that's when I would call

6    Urania, and she and the police officer will go to

7    investigate.

8        Q    And she works with Atlanta Public Schools; is

9    that correct?

10       A    That's correct.

11       Q    So there was a 14-year-old that hadn't been in

12   school all year?

13       A    Right.

14       Q    How serious is that from a social services

15   perspective?

16       A    It's very serious.  We want -- according to

17   the law, kids are supposed to be in school until --

18   legally until age 16.  As far as us, citizens, and the

19   social worker, we want our kids educated.  So it's very

20   important to us to get them in school.

21       Q    Can you tell me the relationship between your

22   office and -- I'm sorry.  This one's been answered.

23   I'll just strike that.

24              What is your role with regard to providing

25   services to disabled students?

                                                        29

Rodney Harleston - December 6, 2016

1        A     With disabled students, we have what they call

2    504.   504 is for kids with any type of illness or

3    disability or whatever that prevents them from coming

4    to school or being enrolled in school.

5              So the student support team chair -- I guess

6    the title would be chair -- is who handles that.  So if

7    I had a kid like that, I would contact my 504 person

8    and say we have this, and we'll try to figure out what

9    we need to do to get the kid to school.

10       Q     So if a child can't get to school because

11   they're immobile or disabled, the school will help that

12   child get to school; is that right?

13       A     My understanding, yes.

14       Q     Can you tell me your role with regard to

15   providing services to disabled parents?

16       A     I have never had a role to help a disabled

17   parent.

18       Q     If there were a disabled parent that, for

19   example, couldn't hear, would you and the school work

20   with them to figure out a way that they could

21   understand what was happening in a parent-teacher

22   conference?

23       A     Yes, we would.

24       Q     So it does make sense theoretically that the

25   school helps out disabled parents with regard to

                                                          30

1    certain services; is that right?

2        A    Yes, that's correct.

3        Q    So if there are disabled parents in your

4    school district, that would be something -- you said it

5    hasn't come across your plate yet.  But if there were

6    disabled parents that were having trouble accessing

7    certain services, that would come across your office?

8        A    Maybe I can understand your question another

9    way.  We do have disabled parents, parents, something

10   that physically or whatever is wrong with parents, and

11   we do -- the social worker, we try to figure out

12   whatever we can to help that parent out.  We do

13   referrals, whatever we can do to try to help that

14   parent out.

15       Q    And so parents -- so going back to the example

16   about parents, when they participate in parent-teacher

17   conferences, what are some other situations where

18   parents participate in school -- or I'll just strike

19   that, actually.

20            So it's correct that parents -- is it correct

21   that parents need to be a part of their children's

22   education by participating in parent-teacher

23   conferences, for example?

24       A    Of course.

25       Q    And is it also correct that parents need to be

31

1    a part of their children's education by participating

2    in IEP meetings?

3        A    Yes.

4        Q    As well as would you also say the same goes

5    for 504 plan meetings?

6        A    Yes.

7        Q    And under the compulsory education law,

8    parents are responsible for getting their kids to

9    school; isn't that right?

10       A    That's correct, ensuring that their children

11    come to school, yeah.

12       Q    So if a parent needs help with accessing --

13    excuse me.  If a parent needs help with participating

14    in one of these services that we just discussed --

15    strike this.  Sorry.  Strike that.

16           So in your job as a school social worker, have

17    you ever dealt with a situation involving challenges

18    students face due to the disability of their parents?

19       A    Yes and no, I have.  I have helped -- you

20    know, I can't be specific to tell you.  I've helped

21    parents get to the school because they were not

22    financially able to get to the school for their -- for

23    meetings or whatever.  I try to find someone or find a

24    Breeze card to get the parent to the meeting if they

25    can't get there.

32

1           I've had situations where, you know, the

2    principal insists that the parent come to the meeting,

3    and we can't transport them in our car.  So I would try

4    to find, you know, a Breeze card or whatever, whatever

5    it takes.  We all -- the social workers do things like

6    that whenever we can.

7       Q    So there's been a situation you just said

8    where a parent with a disability was not financially

9    able to get their children to school and you helped

10   that parent get to school?

11      A    When you say "disability," I was saying as a

12   school social worker, whatever kind of problem they had

13   that would prevent them from coming, I try to figure

14   out something.  I do remember a situation come up a lot

15   when the parent can't -- don't have transportation and,

16   then I try to work out something, try to get a Breeze

17   Card or something like that.

18           And I don't know if I've come across a parent

19   with disability.  I can remember some instances, you

20   know, the parent is ill or whatever and they can't come

21   to the school, and normally what will happen -- that's

22   happened a lot in my career, a parent can't get to the

23   school.

24           So a lot of times, the principal will

25   correspond between myself and the parent.  Either I

33

1    take documents there or whatever it takes, you know, to

2    educate a child.  That's what we try to do.

3        Q    So earlier when you said when a parent is not

4    financially able, it was almost as if that was their

5    inability.  It wasn't that they had some physical

6    disability?

7        A    Right.

8        Q    So if a parent is not financially able to get

9    to school, you have in the past helped that parent get

10   to school?

11       A    Yes, I have.

12       Q    And can you explain what a "Breeze car" is.

13       A    I'm sorry.

14       Q    That's okay.

15       A    It's a MARTA card.  It's a MARTA card.

16       Q    Card?

17       A    Right.

18       Q    I understand.

19            So the school has a small -- so the school has

20   purchased Breeze cards for parents before?

21       A    No, they haven't.  Sometimes we find them

22   different places.  My coworker, they may come across.

23   We do Breeze cards for homeless students.  That's part

24   of the law.  The school get Breeze cards for various

25   things.  But I have been able -- was to find Breeze

34

Rodney Harleston - December 6, 2016

1    cards sometime.

2        Q    And you also mentioned that sometimes a parent

3    is ill; is that right?

4        A    Right.

5        Q    So if a parent is ill and for that reason

6    can't get to the school, it sounds like you said in the

7    past you've helped that parent get to the school; is

8    that right?

9        A    Yes.  I mean, I've -- not for -- I've taken --

10   I'm trying to find a for instance.

11           I've had homeless students and the parent

12   didn't have -- I've had students, the parents didn't

13   have transportation to come to the school to register

14   their kids.  So I carried the registration packet to

15   the parent, as a social worker, to the parent and

16   worked with the school that way to get the child

17   enrolled.  Those are the sort of things I was trying to

18   explain.

19       Q    Sort of whatever you can to help?

20       A    Right, whatever.

21       Q    Did you attend Therrell High School

22   graduation?

23       A    Yes, I did.

24       Q    The current one, 2016?

25       A    20 --

                                                          35

1      Q      This year?

2      A      I did.

3      Q      And was there a sign language interpreter at

4   that graduation?

5      A      Yes, there was.

6      Q      Is there a monitor with closed captioning?

7      A      I'm a little positive there was, but I was

8   taking up tickets.  I was sitting in the back.  It's

9   kind of hard to see up front.  I'm almost positive

10  there was.  I don't know for sure.

11     Q      Has there ever been a situation where the

12  school got an interpreter, a sign language interpreter,

13  to come to the school for other examples?

14     A      Yes.

15     Q      Can you tell me some of those reasons?

16     A      Well, I mean, in the past, not since I've been

17  at Therrell or Continental Colony, but with the ESOL,

18  English as a second language, we used to -- we have

19  people that can't -- doesn't speak English, or we have

20  people that need some kind of sign language or anything

21  of that.  We would call them, and they would come to

22  the school.

23     Q      So if a parent can't participate in their

24  child's education because of English as a second

25  language, the school will provide a service such as an

36

Rodney Harleston - December 6, 2016

1    English -- such as an interpreter to help -- to ensure

2    that they can participate; is that right?

3         A    Yeah.

4         Q    In so doing, the child is benefiting as well

5    because their parents are therefore more a part of

6    their education; isn't that right?

7         A    Yes.

8         Q    And isn't it true, then, that that interpreter

9    is also of benefit that is being given to the parent?

10        A    I didn't understand.

11        Q    So the parent doesn't speak English but the

12   child does; is that right?

13        A    Yes.

14        Q    And would you agree that the interpreter is

15   being given as a benefit to the parent?

16        A    Yes.

17        Q    In your job as a social worker, how often do

18   you deal with challenges students face due to

19   disabilities -- I'll strike that.  I'll strike that.

20             So this may be repetitive because we've talked

21   about it some.  Can you tell me about situations where

22   children have no way to get to school that we haven't

23   already discussed?

24        A    Ask me that again.

25        Q    I'm wondering about examples of situations

37

1    where children couldn't get to school.  Can you tell me
2    about other examples that you can recall?
3        A    When you say "couldn't," I'm not -- "couldn't"
4    mean they didn't have transportation, may be homeless,
5    and we provide -- through the homeless liaison we
6    provide transportation.  Maybe that's what you're
7    talking about.
8        Q    Maybe it is.
9        A    Something like that.
10       Q    So can you tell me more about that initiative,
11   transportation for homeless?
12       A    Well, it's a federal law, McKinney-Vento Act,
13   that if a child is in their school of origin, say, for
14   instance, a student becomes homeless while they're --
15   during the year of their school of origin, then it's
16   the school's responsibility to help that child get back
17   in that school.
18       Q    And so what does the school do to help them?
19       A    Well, it depends.  If they -- sometimes we
20   would try to do -- we do MARTA cards, school bus or
21   things like that.
22       Q    And does the school sometimes provide
23   transportation?
24       A    Yes.  It's the law that we have to.
25       Q    They provide transportation by giving MARTA

38

1   cards; is that right?

2        A     Yeah, whichever they need.  Sometimes we can

3   connect them with a bus or local transportation.  They

4   may get a bus.  And sometimes it's more convenient, the

5   Breeze cards.  Like with high schools, it's more

6   convenient with Breeze cards.

7        Q     But sometimes a bus is rerouted to help the

8   homeless children get to school; is that right?

9        A     Yes.

10       Q     Are you aware if ever a bus has ever been

11  rerouted to help homeless children get to school where

12  the new route goes into the walk zone?

13       A     Ask me that again.

14       Q     So the walk zone is an area about a mile --

15       A     Within a mile, right.

16       Q     -- from the elementary schools.  And as I

17  understand it, it's a mile and a half from high

18  schools.

19       A     Okay, right.

20       Q     Are you aware of any times where a bus was

21  rerouted to pick up someone in need of transportation

22  in a walk zone?

23       A     No, not even homeless.

24       Q     I'm sorry?

25       A     Not even homeless.  If they're homeless and it

                                                          39

1    was within a mile and a half, they would still walk.

2        Q    All right.  I'm going to move on a bit to just

3    the training that APS has given you over the years.

4             So what training has APS given you to help you

5    in your duties as school social worker?

6        A    It's so much.  I mean, we have monthly

7    in-services from everything that comes under social

8    work, Atlanta Public Schools.  I mean, the list is

9    long, from homelessness to --

10       Q    So a range of topics?

11       A    Right.

12       Q    About how often do you attend the training?

13   Once a month or more frequently or less, would you say?

14       A    I guess it depends on what kind -- we have --

15   social workers, we have our monthly in-service.  We

16   have monthly in-services, right.

17       Q    Have they ever provided you with training to

18   better assist individuals with disabilities?

19       A    We've had people talk who come with

20   disabilities.  We've had, like, especially with the

21   504, the people that work with the 504 in the schools.

22   I can't say recently if we had someone outside that

23   came.  Not recently, I would say.  I would remember

24   that.

25       Q    So can you try to estimate the last time there

40

Rodney Harleston - December 6, 2016

1    was a training that you attended with regard to better

2    assisting people with disabilities?

3        A    You're saying "training."  You're not talking

4    about -- I'm a social worker.  We have our social

5    worker training.

6        Q    Yeah.

7        A    I could say that was this school year.  It's

8    going to be -- did we have it -- I think we had it --

9    when we come back to school for the new year, we always

10   have updates, different updates and things from special

11   ed, and students with disabilities, academic, or

12   disabilities.  We'll go through the 504.  We always

13   have updates from them.  And I think we had it, like,

14   in August, sometime in August.  I'm not for sure.

15       Q    Okay.  Thank you.

16       A    But it's always here.

17       Q    And so in this situation with Ms. Todd, we're

18   dealing with a parent who has a disability, but her

19   students are not disabled; is that right?

20       A    Right.

21       Q    So when this came across your desk, was it

22   something new, a situation, meaning is it new or was it

23   new when it was a parent who was disabled but not her

24   students?  Was that a new situation for you?

25       A    That's a new situation where it was going to

41

Rodney Harleston - December 6, 2016

1    affect the child for the entire school year.  I would

2    say most of the situations is like as I said:  We try

3    to get the parent to school, maybe get a Breeze card or

4    whatever.  But that was new for something that would be

5    for the entire year.

6        Q    So would you agree that this situation is

7    pretty unique?

8        A    Yes, it is.

9        Q    You've been a social worker for 25 years; is

10   that right?

11       A    Right, with the school system.

12       Q    With APS?

13       A    Right.

14       Q    And prior to that, you were a social worker

15   elsewhere?

16       A    Yes.

17       Q    So in cumulative, since you graduated, you

18   said, in the mid '80s?

19       A    Right, '86, December '86.

20       Q    So I'm not very good at math, but maybe 31

21   years or 30?

22       A    I guess, something like that.  I'm not good

23   with math.

24       Q    In all those years, did you ever encounter a

25   situation like this one?

                                                        42

Rodney Harleston - December 6, 2016

1     A     No.

2     Q     And you go to -- sorry.

3     A     I can't think of one.  I can think a while; I

4   may think of something.  I don't remember anything

5   offhand.

6     Q     You have friends and colleagues who are other

7   social workers, right?

8     A     Yes.

9     Q     And you maybe have attended a conference for

10  social workers?

11    A     Yes.

12    Q     Have you ever heard of someone else talking

13  about a situation like this?

14    A     No, not exactly like this one.

15    Q     And I'm just going to clarify for myself and

16  for you what I mean by "like this."  So this mother is

17  blind, but her children are not; is that right?

18    A     That's correct.

19    Q     And she lives in a walk zone.  So APS won't

20  give her transportation?  And she lives in the walk

21  zone; is that right?

22    A     Yes.

23    Q     And because she lives in a walk zone, there's

24  not a standard bus route that will stop in the walk

25  zone; is that right?

                                                    43

Rodney Harleston - December 6, 2016

```
 1        A     Correct.

 2        Q     And the children, one of them was 4 years old

 3   when this school year started; isn't that right?

 4        A     The pre-K, I think, yes.

 5        Q     Are you aware that the walk to school doesn't

 6   have sidewalks?

 7        A     I'm aware that a part of the walk doesn't have

 8   sidewalks.

 9        Q     That's actually -- that's correct.  Thank you

10   for that.

11              So part of the walk doesn't have sidewalks?

12        A     Correct.

13        Q     And so what I mean by a "situation like this"

14   is -- and I just want you to confirm if this is also

15   your understanding when you were answering the previous

16   questions -- is a situation where we have a blind

17   mother who can't walk, who can't accompany her children

18   to school on that walk, but because they as a family

19   live in the walk zone, there's no bus service in that

20   area, and there are no sidewalks along that route.  And

21   so the mother is saying it's too dangerous for my kids

22   to walk alone.  I can't do it, and I don't have family

23   to do it.

24              So that situation that I just described, would

25   you agree that that's a fairly unique situation?
```

44

Rodney Harleston - December 6, 2016

1        A     It is.

2        Q     So in your professional estimation, is this

3    type of situation likely to repeat itself in the

4    future?

5              MR. WARCO:  Object to form.

6    BY MR. FLACK:

7        Q     You can answer.

8              MR. WARCO:  You can answer.

9        A     (By the Witness)  When you say "unique," we've

10   always worked things out, you know, from a social

11   worker point of view.  I mean, we've done unbelievable

12   stuff to get kids to school.

13             It's some kind of way that we can figure this

14   out, you know.  We can find somebody to walk with them.

15   The principal and I were throwing out things that I

16   said earlier.  So this is unique that I couldn't figure

17   out anything.  Did that answer your question?  I don't

18   know.

19        Q     Yeah.  And I'm also wondering:  You said you

20   haven't seen anything like this or heard of anything

21   like this from your colleagues in the last 30 years; is

22   that right?

23        A     Heard anything . . .

24        Q     That was when I was talking about whether --

25        A     Okay.  When you asked me that, you're saying

                                                           45

Rodney Harleston - December 6, 2016

1    that from my colleagues or my experience where a parent

2    refuses to send a kid to school because they don't have

3    a bus or the parent is disabled and they're not sending

4    kids to school?

5        Q    I'll just move on now.

6             So now I just want to talk about the timeline

7    of events with your interactions with Ms. Todd and

8    Mr. Dennison.

9        A    Okay.

10       Q    But before we turn to this, like I said at the

11   beginning, we can take a break anytime you need.

12       A    I'm fine.

13       Q    But just let me know.

14       A    Okay.

15       Q    So earlier you said that the first time you

16   talked with anyone from the Dennison/Todd family was

17   August 11th; is that right?

18       A    Yes.  I'm almost positive that's right because

19   that's when I notified transportation.  So it had to be

20   it.

21       Q    On or about August 11th; is that right?

22       A    Yes.

23       Q    And again earlier you said that prior to that

24   you had not had any interaction with them -- sorry.

25   Strike that.

                                                          46

Rodney Harleston - December 6, 2016

1              Prior to August 11th, you hadn't even heard of

2     the situation with this family; is that right?

3          A     Seemed like before that it wasn't brought to

4     me as a social worker of needing something, but I want

5     to say I heard someone in the office, maybe the

6     secretary or somebody, say we have some kids that the

7     parent refuses to send to school and they want bus

8     transportation.

9              But it was -- and I think at that time, it was

10    something that we're going to get something

11    accomplished.  They're going to come -- working up a

12    plan, that she was refusing to get the kids to school.

13         Q     So you heard someone mention something about

14    this family?

15         A     I do.  I remember.  Yeah.

16         Q     Do you distinctly have a memory that she

17    used -- or that the person you heard say something

18    about this used the word "refused"?

19         A     Let me think.  I can't remember the word

20    "refused."

21         Q     That's fine.

22             So when you spoke to Mr. Dennison on August

23    11th, did he tell you that Ms. Todd was blind?

24         A     Yes, he did.

25         Q     Did he tell you that because of this

47

Rodney Harleston - December 6, 2016

1    disability she's not able to accompany her kids to
2    school?
3         A    Yes.
4         Q    And did she tell you that she wanted her kids
5    to go to school?
6         A    Yes.  Did she or he?
7         Q    Thank you.  You spoke to Mr. Dennison?
8         A    Correct.
9         Q    That's correct.  So did he tell you that he
10   wanted his kids to attend school?
11        A    Yes.  He said he came and walked them the
12   first few days to school.
13        Q    Okay.  I want to show you one document.
14             MR. FLACK:  Laurance, I've got a copy
15        for you.
16             I'm going to mark this as the next
17        exhibit.  I'm marking it as Exhibit N.
18             (Exhibit P-N was marked.)
19   BY MR. FLACK:
20        Q    This is a handwritten log by Ms. Daffanie Todd
21   about her interactions with Continental Colony
22   Elementary School officials.
23             Can you turn to the second page?  And I will
24   just read from the top.  After the "circumstance," she
25   says, "Again I explain my situation on August 5th,

48

1    2016.  Dr. Vaughn passed my problem to the social

2    worker on the week of August 8th."

3        A    I don't see that.

4        Q    I'm sorry.  I'll start again reading from

5    right there, and, again, this is her handwritten notes

6    or recollection.

7            She says, "Again I explain my situation on

8    August 5th, 2016.  Dr. Vaughn passed my problem to the

9    social worker on the week of August 8th.  I spoke with

10   a Mr. Usher, district superintendent, CCES, his

11   secretary, Ms. Viola, and Mr. Rodney, social worker,

12   CCES."

13           So I wanted to see if you think you might have

14   spoken with Ms. Todd during the week of August 8th.

15   And August 8th was a Monday.  You just stated that you

16   spoke with Mr. Dennison on the 11th, which would be

17   Thursday of that week.

18           Do you have any recollection that week of

19   speaking with Ms. Todd?

20       A    My first time ever talking to any of the

21   family members was Mr. Dennison.

22       Q    On the 11th?

23       A    Right.

24       Q    Okay.  Did Dr. Vaughn -- I'll go off the

25   record.

                                                        49

```
 1              (Recess from 2:44 p.m. to 2:53 p.m.)
 2    BY MR. FLACK:
 3         Q    So you said earlier that August 11th was the
 4    first time you heard about this issue, the issue of
 5    Ms. Todd being unable to get her children to school; is
 6    that right?
 7         A    August 11th was when I got the phone call from
 8    Mr. Dennison explaining the situation, yes.
 9         Q    And prior to that, you hadn't even heard about
10    this issue except maybe some office discussion?
11         A    I may have, you know.  If something would come
12    back as I was reading this, I was trying to remember
13    when was that that Dr. Vaughn said, well, we have this
14    family who wants transportation.
15              And so I -- either she said I contact
16    transportation and they said no way; either she was
17    saying that they did.  But I do think it may have been
18    prior to the 11th, and I think it's when she said
19    something about --
20         Q    It's on the second page.
21         A    Somewhere in here, it says the week of August
22    8th she spoke.  I think she talked with Dr. Vaughn, and
23    it could have been around that time, but it wasn't
24    like -- it wasn't, I need your help or she sent me a
25    referral.  I think that she thought that it was
```

50

Rodney Harleston - December 6, 2016

1    completed when she referred it to transportation, and I
2    think that was probably between the 8th and the 11th.
3            But as far as the family, my first time
4    hearing from a family member was Mr. Dennison on the
5    11th.
6       Q    But you just said that perhaps Dr. Vaughn
7    spoke with you about it before the 11th?
8       A    Yes, but not in a problem sense, what I'm
9    saying.  I think it was more she said something about
10   it, but she felt like she was working it out because
11   she had called transportation or referred to
12   transportation, something like that, yes.
13      Q    Okay.  I'm going to show you another document
14   which I'll mark as Exhibit O.
15           (Exhibit P-O was marked.)
16   BY MR. FLACK:
17      Q    Do you see the entry dated August 17th,
18   Mr. Harleston?
19      A    Yes.
20      Q    And it references a meeting on August 16th?
21      A    Yes.
22      Q    So isn't it correct that you had a meeting
23   with Ms. Todd and other school officials on August
24   16th?
25      A    Yes.

                                                        51

1      Q    Can you tell me what actions you took, if any,

2   between the 11th and August 16th with regard to

3   Ms. Todd's situation?

4      A    The 11th.  Oh, I emailed transportation, which

5   you saw the email on one of the exhibits.  I emailed

6   transportation for Mr. Dennison.  We had another

7   conversation maybe a couple of days after that.  He

8   called and -- he was still complaining with

9   transportation, said they couldn't provide

10  transportation, and asked me what I could do, and --

11     Q    Wait.  I'm sorry.  When you say he called and

12  asked you, can you just say who you're talking about?

13     A    I'm sorry.  It was sometime between -- after I

14  did send the email, Mr. Dennison did call me back,

15  maybe a couple of days, maybe three days.  I can't

16  remember for sure.

17          He said they're not going to provide

18  transportation for his children, and he said he was

19  going to call the news.  He was going to call downtown.

20  I said, you know, you can talk to another supervisor,

21  go up the ladder, but there's nothing I can do as far

22  as with transportation.  That was out of my

23  jurisdiction.

24          I did have a conversation and told Ms. Todd on

25  the phone.  She complained about not having

52

Rodney Harleston - December 6, 2016

```
 1   transportation, and it was more a let's try to figure
 2   something out kind of thing with her, but she didn't
 3   want to do that.  She wanted transportation.
 4            That's when the meeting was scheduled -- no.
 5   After that, the meeting was scheduled for the 16th.  So
 6   there was some talk in between.
 7            Like I said, I was assuming it was something
 8   we would work out, get the kids to school.  I didn't
 9   know it was going to go this far.  But because nothing
10   was -- nothing had happened and the kids was still out
11   of school, she did agree to meet on the 16th.
12        Q    So who requested that meeting?
13        A    Someone downtown.  I don't know for sure.  I
14   would assume it might have been Dr. Spiller, but I
15   don't want to say because I don't know.  But I do know
16   that Dr. Anthony, I can tell you, for a very short
17   period of time, she came to the meeting.
18        Q    Who else do you remember was at that meeting?
19        A    Dr. Anthony, Dr. Vaughn, Mr. Dennison,
20   Ms. Todd and myself.
21        Q    Was Nicole Spiller at the meeting?
22        A    No, she wasn't.
23        Q    So what I think I heard you say was that
24   between your first conversation with Mr. Dennison and
25   the meeting, you had one other conversation with
```

53

1    Mr. Dennison and a conversation with Ms. Todd; is that

2    right?

3         A    I'm not going to say it's accurate.  It may

4    have been a couple with Mr. Dennison, a couple with

5    her.  I can't remember, but we did have conversations.

6         Q    And do you remember if you called them or if

7    they called you?

8         A    I know I called -- I've called Mr. Dennison

9    before and I've called Ms. Todd because I remember

10   Ms. Todd corrected me when I said "her husband."  I was

11   thinking they were married.  And she said, "No, that's

12   my children's father.  That's not my husband."

13             And we talked about them with the

14   transportation issue and just talking positive about we

15   got to work this thing out, the kids need to come to

16   school.  We never had any disagreement between the

17   three of us.

18        Q    I think one of the next documents I would like

19   to introduce has already been introduced -- well,

20   Exhibit G and Exhibit O are the same.  They're both

21   Bates stamped 228.

22             MR. WARCO:  Although Exhibit O -- I'll

23        note for the record -- has more pages to it

24        than Exhibit G.

25             MR. FLACK:  Thank you.

                                                      54

1    BY MR. FLACK:

2        Q    So I want to keep discussing the first page of

3    Exhibit O.  You were participating in this meeting

4    because you were the school social worker; is that

5    correct?

6        A    Yes.

7        Q    And at that meeting, Ms. Todd was asking for

8    an accommodation for her blindness; is that right?

9        A    For her children to come to school because she

10   was blind.  Is that what you're saying?  Yeah.

11       Q    So she was asking for some school-sponsored

12   means of getting the kids to school?

13       A    Yes.

14       Q    Because her blindness was preventing her?

15       A    Yes.

16       Q    And so, in effect, she was asking that her

17   children be given access to their educational program;

18   is that right?

19       A    She requested bus transportation so her kids

20   could come to school.  That's what she was requesting.

21       Q    Thanks.  I agree.

22            Because without that transportation that she

23   was requesting, the children wouldn't be able to get to

24   school; isn't that right?

25            MR. WARCO:  Object to form.

                                                         55

1    BY MR. FLACK:

2         Q    You can answer.

3              MR. WARCO:  You can answer.  Sorry.

4         Unless I tell you not to answer, you always

5         answer.

6         A    (By the Witness)  Okay.  Ask the question

7    again.  You asked me that -- say it again.

8         Q    I was following up on the previous question.

9    I was saying she was requesting a school-sponsored

10   means for her children to get to school?

11        A    Yes.

12        Q    And that's because without a school-sponsored

13   means of her children getting to school, she had stated

14   to the school that she wouldn't be able to get them

15   there through any other way?

16        A    Correct.

17        Q    Isn't it also correct that she was asking APS

18   to send a bus to her house?

19        A    Yes.

20        Q    There's also in the August 17th entry a

21   reference to a three-day attendance letter; is that

22   right?

23        A    Yes.

24        Q    What is a three-day attendance letter?

25        A    That's when the children have missed three

56

Rodney Harleston - December 6, 2016

1    unexcused days.  And it could have been a few more.  I

2    can't remember for sure.  That is the first letter that

3    was sent out.

4         Q    And did you send that on August 17th?

5         A    Yes.  It was after the meeting.

6         Q    So the meeting was on August 16th?

7         A    Yes.

8         Q    So is it possible you sent that letter on the

9    16th and put the entry in about what you did just the

10   following day?

11        A    I mailed the three-day letter on the 17th.  I

12   was referencing the meeting on the 16th because what

13   happened was I explained to them, you know, about the

14   attendance law after the meeting.  I explained to them

15   the attendance law, I don't have any control over it.

16   So I just hope we don't have to go to court.  But I

17   have to do my job.  So the next day -- I do remember

18   the next day was the day that I sent the letter.

19              (Exhibit P-P was marked.)

20   BY MR. FLACK:

21        Q    Okay.  I'm going to hand you what I marked as

22   Exhibit P.

23              If you would turn to the back, Mr. Harleston

24   -- I'm sorry.  If you would turn to the page numbered

25   225 in the bottom right corner, which is the

                                                          57

1    third-from-last document in Exhibit P.

2            Is this the three-day letter that you sent to

3    R.D.D.?  There's a date at the top right.

4        A    Yes.

5        Q    And is Document 226, which is the next page,

6    the three-day letter that you sent to R.E.D.?

7        A    Yes, it is.

8        Q    Then can you tell me about what Document 227

9    is, which is the next page?

10       A    That's a copy of the Georgia Compulsory School

11   Attendance law.

12       Q    Why did you include that?

13       A    Because it's part of our job to make sure that

14   parents -- even though we verbally explain to the

15   parent the attendance law, because I don't know it all

16   the way through.  So we tell them the gist of it.  But

17   just to make sure that they understand it, we send it

18   to the parent.

19           And I did put in my note -- well, I know she

20   was blind, Ms. Todd is blind, and I know she couldn't

21   read it.  When I did talk to Mr. Dennison, it was my

22   understanding -- I was still thinking that they were

23   married at that time.  I let him know that I did send a

24   copy of the law.

25       Q    I want to make one clarification for the

                                                        58

Rodney Harleston - December 6, 2016

1     record.  Referring back to Exhibit N, I had said that

2     Ms. Todd wrote this.  But I just wanted to clarify that

3     she actually read it out loud and one of her children

4     wrote it down.

5            So at the meeting, did you say to Ms. Todd and

6     Mr. Dennison that you would be sending these letters?

7       A    After the meeting, they were kind of upset,

8     and we walked out, and they calmed down, and we were

9     talking about it.  Like I said, we didn't have a bad

10    relationship.  They wasn't angry with me.

11           I was explaining my role and that I hoped I

12    wouldn't have to refer the case to court, but -- and

13    that at the time, we did talk about the law.

14      Q    Did you tell her that you would be sending

15    these letters?

16      A    I don't remember saying -- telling her I would

17    send the letter.  I explained my role and what could

18    possibly happen or what I may have to do down the line.

19      Q    And so at the meeting, that was the first time

20    you met Ms. Todd; is that right?

21      A    Yes.

22      Q    And so you had been told prior to that that

23    she was blind?

24      A    Yes.

25      Q    But on August 16th at the meeting, you saw

                                                        59

1    her, and you were very much aware that she was blind;

2    is that right?

3         A    Yes.

4         Q    And why is there no document for their

5    youngest daughter, D.T.?

6         A    Because De'anna didn't come under the Georgia

7    Compulsory School Attendance law.

8         Q    Thank you.

9              And so is it correct that you had included

10   Document 227, which has the compulsory education law --

11   is it correct that you included that in the letters so

12   that Ms. Todd would know the penalties for failing to

13   get her kids to school?

14        A    Yes.

15        Q    Because under this law, it's the parent's

16   responsibility for getting their kids to school; is

17   that right?

18        A    Yes.

19        Q    So if we could just now -- did you send

20   additional letters to Ms. Todd regarding her children's

21   absences?

22        A    No.  She probably got something from the

23   attendance committee.  Those three were mine.  They had

24   my signature on it.

25        Q    Okay.  So can we turn to Document 224.  Is

                                                          60

Rodney Harleston - December 6, 2016

1    this a document that you think you may have sent to

2    Ms. Todd?

3         A    Yes.

4         Q    Because that's your name and signature at the

5    bottom; is that right?

6         A    Yes.

7         Q    And the date in the top right is the 23rd; is

8    that right?

9         A    That's the date it was generated, yeah.

10        Q    So did you send a second warning letter to

11   Ms. Todd?

12        A    You know, I'm remembering now.  We learned --

13   they did something with Infinite Campus, which

14   generates our letters, something with Infinite Campus

15   that generates our letters.  I learned that so I think

16   I do remember sending it so they would know how many

17   days it was.

18             See, initially we had our standard letter.  We

19   had our standard letters, and -- wait a minute.  We had

20   our standard letters -- it's the same one.  You're

21   saying that I sent more than one, right?  Is that what

22   you're asking me?

23        Q    I'm asking you if this is the second warning

24   letter that you sent to R.E.D. or that you sent to

25   Ms. Todd regarding R.E.D., the document --

                                                          61

Rodney Harleston - December 6, 2016

1      A      Yeah.  I'm pretty sure it is.  Yes.

2      Q      And then turning back a page to Document 223,

3   is this the second warning letter that you sent

4   regarding R.D.D.?

5      A      222 or 223?

6      Q      223.

7      A      Yes.

8      Q      Okay.  The report was generated on the 23rd of

9   August.  Do you have any recollection as to when you

10   sent these letters?

11      A      The first letter was the 17th.  The second

12   letter was the 24th.

13      Q      Thank you.  Okay.  And now moving back to the

14   beginning of this packet of Exhibit P, Document 220,

15   can you identify this letter?

16      A      That's a standard letter.  We have a

17   attendance committee for -- all schools have their own

18   attendance committee, and that is a letter from the

19   student attendance committee in efforts to improve

20   attendance.

21      Q      And it's to what?

22      A      It's in efforts to improve attendance.

23      Q      If the report was generated for this document

24   on 8/25, was it likely sent on or around the 25th of

25   August?

                                                          62

1     A    I don't know.  I don't have anything to do

2    with this.

3     Q    So when will an attendance committee -- can

4    you try to explain -- I don't fully understand -- the

5    interactions between your letters and then the

6    attendance committee, which also sends letters?

7     A    Well, you know, this year it's a little

8    different at Continental Colony.  They are really

9    trying to improve their attendance.  We have this

10   competition in the cluster.  I think it's a little

11   plaque or whatever.  But we have some attendance

12   issues.

13        So Dr. Vaughn -- this is her first.  She's

14   new, and she's really serious about wanting to improve

15   attendance.  So the committee will meet monthly.  We

16   meet monthly, and they just come up with strategies and

17   ways to improve attendance.  It could be for having

18   parties for perfect attendance or whatever, whatever.

19   So they are really serious about it.

20        And you may see some kids getting, I mean,

21   letter, letter, letter.  They even asked me about

22   kids -- I can only deal with my letters with kids who

23   are unexcused absences, kids that come under the

24   Georgia Compulsory School Attendance law.  But they're

25   so serious about attendance.  She has a list, wanting

63

1    me to call to encourage the parents to send them even

2    though, you know, so just real serious about

3    attendance.  So different people may just send out

4    letters to get the kids to school.

5         Q    That makes sense.  Thank you.

6              So this doesn't count as the third warning

7    letter; isn't that right?

8         A    I never did like the part "warning," you know,

9    myself, that that was something they came up with.  We

10   had to change our things when the juvenile code changed

11   a couple years or so ago.  And so when they developed

12   the CHINS, they came up with this letter just to show

13   like a sequence of your intervention.

14             If I had to go to court, I will use these

15   letters also just to show that I'm going to try to get

16   the parents to get kids to school.  Everybody -- it was

17   the effort from the attendance committee and everybody

18   from the school.  So I would be able to use those

19   letters.

20        Q    Okay.

21             MR. WARCO:  Keep going.

22             MR. FLACK:  Okay.

23   BY MR. FLACK:

24        Q    Looking back at Document 228 -- all right.

25   I'll actually change what I'm going to ask.

64

1          So looking at the compulsory attendance law or

2     not, I'm just going to ask you some questions about the

3     compulsory attendance law.

4          (Mr. Warco rejoins deposition proceedings.)

5     BY MR. FLACK:

6     Q    So as I think you said earlier -- but you

7     could confirm or clarify -- parents are required to

8     comply with the compulsory attendance law; is that

9     correct?

10    A    The law reads like that.  However, Fulton

11    County does it a little different sometimes, meaning

12    that, yeah, Fulton County juvenile court.  The law says

13    it, but the court looks at it kids -- I think it's 12

14    and under.  They rely more on their parents to get them

15    to school.  So they're kind of heavy on the parent for

16    educational neglect.

17         The kids that are 12 and over, 13 and over,

18    sometimes 11, the judge will charge them with truancy

19    because they're voluntarily not coming to school.  So

20    that's how Fulton County does it.  Now, if a social

21    worker prove a case that a parent is keeping a child

22    out to baby-sit or something like that, then it may go

23    back to the educational neglect part and charge the

24    parent.

25    Q    Thank you.

65

Rodney Harleston - December 6, 2016

1            So what is your understanding of a parent's

2    obligation under the Georgia's compulsory education

3    law?

4        A    They're obligated to ensure that their child

5    is going to school every day.

6        Q    So they're not allowed to ignore the law,

7    right?

8        A    True.

9        Q    And Atlanta Public Schools has a

10   transportation program which helps enable parents to

11   comply with that law, right?

12       A    Yeah.

13       Q    So without using the benefit of Atlanta Public

14   Schools' transportation, parents have to find some

15   other way to get their kids to school; is that right?

16       A    Would you ask me that again?

17       Q    So if a child -- sorry.  If a parent isn't

18   eligible to receive the benefit of APS transportation,

19   then the parent needs to find some other way to comply

20   with the law; is that right?

21       A    Yes.

22       Q    So would you agree that the school buses help

23   parents comply with this law?

24            MR. WARCO:  Object to form.

25            THE WITNESS:  I can answer?  Okay.

66

Rodney Harleston - December 6, 2016

1    BY MR. FLACK:

2        Q    I can restate it.

3        A    Ask me again.

4        Q    Would you agree that the school buses provided

5    by APS help parents comply with this --

6        A    Yes.

7        Q    -- law?

8        A    Yes.

9        Q    And so when a parent is using the bus services

10   because their children are riding on the bus, the

11   parent is benefitting from APS's transportation

12   service.  Would you agree with that?

13       A    Yes.

14       Q    And the compulsory education law requires

15   either private school, home school or public school; is

16   that right?

17       A    Yes.

18       Q    And if parents can't home school, they must

19   either send their children to private school or public

20   school; is that right?

21       A    Yes.

22       Q    And if you can't afford private school, you

23   have to send your kids to public school, right?

24       A    Yes.

25       Q    So the existence of free education is a

67

Rodney Harleston - December 6, 2016

1    benefit that the parents also enjoy.  Would you agree

2    with that?

3              MR. WARCO:  Object to form.

4        A    (By the Witness)  Yeah.

5        Q    You would agree with that?

6        A    Yes.

7        Q    Okay.  So it might be -- so would you agree

8    that you could say that the bus service helps students

9    but also helps parents?

10       A    Yes.

11       Q    And so would you agree that it's a benefit to

12   parents?

13             MR. WARCO:  Object to form.

14       A    (By the Witness)  Yes.

15       Q    So let me get organized for a second.  Strike

16   that.

17             So looking back at Exhibit O, the entry dated

18   9/8 that it appears that you entered where it says,

19   "mailed third attendance letter and filed CHINS with

20   juvenile court," do you see that?

21       A    Yes, yes.

22       Q    So just to clarify, you never sent that

23   letter, and you didn't file the CHINS petitions?

24       A    That's true.

25       Q    I would like to turn to that petition.

                                                        68

Rodney Harleston - December 6, 2016

1      A    May I correct something?

2      Q    Yes, please.

3      A    It's actually a referral and not a petition.

4      Q    Thank you.  You know more about this than I

5   do.  So I appreciate that.

6      A    It changed a couple, few years ago.

7      Q    So do you have a copy of either Exhibit L or

8   M, the CHINS referral in front of you?

9      A    I have my own.  I don't have the one that you

10  labeled.

11     Q    That's fine.

12          I'll show you Exhibit L just so you can look

13  at this one.  Do you see on the second page -- did you

14  write what is in these boxes on the second page?

15     A    I did.

16     Q    Did anyone help you write these sentences?

17     A    No.

18     Q    Or ideas?

19     A    Did anyone help me . . . I bounce stuff off of

20  my coworkers who are parents.  So I'm just trying to

21  remember did I call anybody.

22     Q    Yeah.

23     A    I think I did it all myself.

24     Q    Okay.  Earlier you said that Mr. Dennison and

25  Ms. Todd explained that they really did want their kids

69

1    to go to school; is that right?

2        A    Yeah.

3        Q    I think that's what you said earlier.

4        A    Yeah.

5        Q    And, yeah, they did want their kids to go to

6    school?

7        A    Uh-huh (affirmative).

8        Q    So here when you wrote Ms. Todd and

9    Mr. Dennison refused to send R.D.D. to school, can you

10   explain what you meant by "refused"?

11       A    When you asked me and said they did, ask me

12   that question again.

13       Q    Can you explain what you mean here by

14   "refuse," what you meant?

15       A    Oh.  Because according to policy, they were in

16   walking distance, and they had to walk to school,

17   didn't provide transportation.  So that word is because

18   they refused to allow them to walk.

19       Q    So did she -- but didn't -- at some point, did

20   she tell you that she was unable to walk because she's

21   blind?

22       A    She is unable to walk.  She's blind.

23       Q    Did she explain that she didn't want her kids

24   to walk alone?

25       A    Yes.  She did talk about that.

70

Rodney Harleston - December 6, 2016

1        Q    So she refused to let her kids walk alone down
2   this street; is that right?
3        A    Yes.
4        Q    Now, I want to talk a bit, going back to the
5   August 16th meeting.  Were there any discussions of
6   alternative proposals and ways that the school and you
7   could help the children get in to school?
8        A    Yeah.  We were trying to come up with ways,
9   you know.  Actually, like I said, at that -- prior to
10  that meeting, because we normally figure things out to
11  make things work, we felt -- because we're not
12  transportation.  I mean, we're all support staff at
13  that table, and the goal was to find some kind of way
14  to make things work for the children to come to school.
15            And Dr. Vaughn, who is the principal, and I,
16  we were just talking a few days before, whatever, about
17  situations.  We had a couple of kids that walked their
18  way, and they were positive, and "positive" meaning
19  they didn't get into trouble.  They respond when they
20  call their parents on the cellphone when they get to
21  school because the parents that work.  So that was one
22  of the things that she and I, we just threw out.  We
23  thought that may work.
24        Q    I'm sorry.  Is that the idea that has been
25  referred to as a walking pool?

                                                        71

Rodney Harleston - December 6, 2016

1      A    I had heard before that it was a parent that

2   was going to walk.  That was never a part of Dr. Vaughn

3   and my conversation.  I think I explained to you, I

4   think, that that was never -- an adult wasn't in that.

5      Q    Yeah.  So if I can just clarify that point,

6   because that was something I wanted to talk about.  So

7   from your understanding of the walking pool, was there

8   ever a parent involved in that walking pool?

9      A    No.

10      Q    So what did the walking pool consist of?

11      A    I don't know where the pool part came.  It was

12   just a conversation that we were trying to figure out

13   to get the kids to school.

14          Dr. Spiller, Nicole Spiller, made reference to

15   that to me also about a parent, and that was my -- I

16   don't know if that was my first time I heard about it

17   or if you had said it or what.  I explained to her no

18   one ever said anything about an adult that I know of.

19   The conversation we had were kids.  And I corrected her

20   on that, and she was under the understanding.  Unless

21   somebody else said it, I don't know anything about it.

22      Q    So you never knew of a parent that was in the

23   neighborhood prepared to walk the children?

24      A    No.

25      Q    To school?

                                                        72

Rodney Harleston - December 6, 2016

1      A    No.

2      Q    Isn't it true that very few children who go to

3  Continental Colony walk to school?

4      A    I don't know a percentage, but a lot of them

5  walk.

6      Q    Okay.  So would you say the majority drive?

7      A    Bus or drive, you're saying?

8      Q    Yes.

9      A    I think we have about 4- or 500.  So probably

10  a majority of them ride, take a school bus, yes.

11     Q    I went out there one morning myself and didn't

12  see hardly any kids walking to school.  I was there

13  right when school was starting around 7:30.  So if a

14  lot of kids are walking, why do you think I didn't see

15  anyone?

16     A    You said "a lot."  I don't have a number, but

17  I can only go by the distances where I know that 2900

18  don't walk.  I know the addresses because I go on home

19  visits and stuff.  I know the ones that are walkers.

20          Sometime I go -- have to be there early, and I

21  see parents, you know, and kids and everybody walking

22  to school.  The ones on Continental Colony Parkway,

23  coming from the mall, those few apartments on that

24  side, they walk.

25     Q    Do you know if many walk on the

                                                    73

Rodney Harleston - December 6, 2016

1    Fountainebleau?

2        A    No, because normally when I -- only time I

3    really went that -- once in a while.  If I'm going

4    home, I go that way, or if I -- and I went to see where

5    they lived.  But, normally, I will come down, come from

6    Therrell High School.  I would come down by Greenbriar

7    Mall.  So I don't come that way enough to see the kids

8    walk that way, especially in the morning.

9             But I do -- the parents complained last year,

10   the year before last, on that side because of weather

11   and kids walking.  I do remember that.

12       Q    Wait.  I'm sorry.

13       A    Not on the Fountainebleau side, but on the

14   Stone Hogan Connector, the one coming from the mall,

15   complaints about that.

16       Q    And earlier you made a clarification that you

17   never did a second home visit, because there was a

18   notation on one of the exhibits that you did.

19       A    Actually, that entire statement doesn't

20   pertain to that family.  So that has nothing to do with

21   the Dennisons.

22       Q    I want to just clarify.  Is that on Exhibit O?

23   Is it the last entry on O?

24            No.  It's not that one.

25            Yeah.  Just so we all are straight, I want to

74

1   figure out.

2       A    That was on 9/27.

3       Q    Yes.  So if you have Document 229 in front of

4   you.

5       A    I do.

6       Q    So that entry on September 27th regarding a

7   home visit just pertains to an entirely different

8   family?

9       A    It does.

10      Q    Okay.  Did you make a home visit with regard

11  to Ms. Todd and Mr. Dennison?

12      A    I think I went to their house once.  I think I

13  went once.  I didn't notate it.  But it was -- I went

14  once, but I can't remember exactly the conversation.

15          But, like I say, it was before all of this.

16  It was more like let's get the thing -- we'll figure

17  out something sort of thing.  I can't remember for sure

18  what day it was or when it was.

19          But we talked so frequently -- well, after

20  this meeting on the 16th -- 17th -- yeah, 16th, 17th,

21  is when the legal issues started.  So I was kind of out

22  of it.

23      Q    So do you think the home visit happened before

24  or after the August 16th meeting?

25      A    I don't even remember, to tell you the truth.

75

Rodney Harleston - December 6, 2016

1      Q    Earlier you had said that your memory was that
2   the first time you met Ms. Todd was at the August 16th
3   meeting?
4      A    Right, right.  So evidently there may -- no,
5   no.  I know for a fact it was the first time meeting
6   her.  So I guess I didn't do a home visit.  That's not
7   in my notes.  We talked so frequently.  I guess I
8   didn't do a home visit.
9      Q    Do you have a memory of entering her house?
10      A    No, I don't.
11      Q    So maybe it's the case that you didn't -- that
12   you never did a home visit?  Is that what --
13      A    I don't think I did one, right.  A lot of
14   times home visit is when you can't contact people or
15   you have to take something or whatever.  So that's
16   probably what that was.  I didn't do one.  So that's
17   probably why I didn't document it.
18      Q    Okay.  And did anyone instruct you, any
19   supervisor, to do a home visit?
20      A    No.
21      Q    Probably not, because if they had, you would
22   have done it?
23      A    Oh, I know.  My supervisor did, but it was --
24   she -- when I had explained to her a little bit about
25   the case because she didn't know.  As I told you

76

Rodney Harleston - December 6, 2016

1      earlier a few days -- it was a little time before.  She

2      had just gotten here.  And she was talking about, well,

3      maybe the parent needs different, other services.

4      Maybe she can't get around in the house.  Maybe she

5      needs -- it was a few things that she was saying.

6             So -- and that time I knew Ms. Todd was angry,

7      and I called her.  I said, well, my supervisor want to

8      know do you need anything else, you know, other

9      services other than the transportation; are you all

10     right in your house.

11            And she said all she wanted from the school

12     was transportation.  So I do remember that.  That was

13     the only time I was instructed that I needed to do

14     that.  But she said I didn't need to do it.  Everything

15     was fine.

16         Q    Are you aware of any times when a school

17     official did pick up a child and helped them get to

18     school?

19         A    I mean, back in the day, you know, years ago

20     when I started, you know, you gave rides, but, you

21     know, policies came out then you can't ride kids in

22     your car anymore.  Different legal actions happen when

23     you do.  Not recently I don't know of any.

24         Q    Earlier you mentioned that Continental Colony

25     is having attendance issues this year; is that correct?   77

1      A     Yes.

2      Q     Can you explain what you meant by that?

3      A     I said this year, last year too.  You know,

4   one of the first things new principals look at or a

5   principal look at regardless of when you come in is

6   your attendance, how the attendance is.  It's something

7   about -- what's that phrase they use?

8          After six days absence, regardless if it's

9   excused or unexcused, I don't know what the CCRP -- I

10  don't know what that -- CCRP -- affects your CCRP with

11  the state.  So when the state looks at it, it's not

12  like excused or unexcused.  The kids missed those days.

13  So, you know, there's a big campaign to -- interest to

14  get your attendance up, get kids to school every day.

15     Q     It sounds like you're aware that some absences

16  are excused and some are unexcused?

17     A     As far as the Dennisons?

18     Q     No.  Just in general.

19     A     Oh, yeah, right.

20     Q     The law permits some excused absences, some

21  absences to be excused?

22     A     Oh, yes, right.

23     Q     Am I right that one of those exceptions is

24  when --

25          MR. FLACK:  I'm sorry.  I'm going to

                                                    78

Rodney Harleston - December 6, 2016

```
 1          go off the record for just a second.  We'll
 2          take a five-minute break.
 3                  (Recess from 3:37 p.m. to 3:43 p.m.)
 4   BY MR. FLACK:
 5          Q    Mr. Harleston, I wanted to refer you back to a
 6   document that was in that packet.  It's Document 225.
 7   Do you see where it says "written excuses from parents"
 8   in the second paragraph?
 9          A    Yes.
10          Q    And then that begins a list of potential
11   written excuses starting with "when personally ill"?
12          A    Yeah.
13          Q    Further below, "weather or other environmental
14   conditions preventing the student from getting to
15   school"?
16          A    Yeah.
17          Q    So are these the exceptions -- sorry.  Are
18   these valid excuses?
19          A    To make the excuses excused, yeah.
20          Q    To make the absences excused?
21          A    Yes.
22          Q    And does this list reflect APS's policy?
23          A    Yes.
24          Q    Is that policy based on Georgia law?
25          A    Yes.
```

                                                        79

Rodney Harleston - December 6, 2016

1      Q    So these excused absences come from the

2    compulsory education law?

3      A    I beg your pardon?

4      Q    These come from the compulsory education law?

5      A    Yeah.

6      Q    And wouldn't you agree that it's fair for

7    parents to rely on this information to determine what's

8    an excused or unexcused absence?

9      A    For parents rely on -- yeah.

10      Q    All right.  Are there any clarifications you

11    want to make to the record?  I don't have anything

12    else.

13      A    No.  I can't think of any.  No.

14          MR. FLACK:  All right.  Then I would

15      like to adjourn this deposition.

16          (Deposition was adjourned at 3:45 p.m.)

17

18

19

20

21

22

23

24

25

                                                    80

1                    C E R T I F I C A T E

2

3              I hereby certify that the foregoing
        transcript was reported, as stated in the
4       caption; that the witness was duly sworn
        and elected to reserve signature in this
5       matter; that the colloquies, questions and
        answers were reduced to typewriting under
6       my direction; and that the foregoing pages
        1 through page 81 represent a true,
7       correct, and complete record of the
        evidence given.
8              I further certify that I am not
        disqualified for a relationship of interest
9       under O.C.G.A. 9-11-28(c); that I am a
        Georgia Certified Court Reporter here as a
10      representative of D'Amico Gershwin, Inc.;
        that D'Amico Gershwin was contacted by
11      the party taking the deposition to provide
        court reporting services for this
12      deposition; that I will not be taking this
        deposition under any contract that is
13      prohibited by O.C.G.A. 15-14-37(a) and (b)
        or Article 7C of the Rules and Regulations
14      of the Board; and by the attached
        disclosure forms I confirm that I/D'Amico
15      Gershwin is not a party to a contract
        prohibited by O.C.G.A. 15-14-37 or Article
16      7C of the Rules and Regulations of the
        Board.
17             The above certification is expressly
        withdrawn and denied upon the disassembly
18      or photocopying of the foregoing
        transcript, unless said disassembly or
19      photocopying is done under the auspices of
        D'Amico Gershwin, Inc., and the signature
20      and original seal is attached thereto.
               This, the 16th day of December, 2016.
21

22

23

24      _____
        CHARNA S. PERLOE
25      Certified Court Reporter A-457
                                                    81