IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAFFANIE TODD, on behalf of
herself; R.D., R.D., and D.T., by and
through their next friend, Daffanie
Todd,

             Plaintiffs,

     v.

MERIA JOEL CARSTARPHEN, in
her official capacity as
Superintendent, Atlanta
Independent School System, and
ATLANTA INDEPENDENT
SCHOOL SYSTEM,

             Defendants.

           1:16-cv-3729-WSD

## OPINION AND ORDER

This matter is before the Court on Plaintiffs Daffanie Todd ("Ms. Todd"),

R.D., R.D. and D.T.'s (together, "Plaintiffs") Motion for Preliminary Injunction [3]

and request for permanent injunctive relief.

## I.    INTRODUCTION

This is a case about how three children will get to and from their elementary

school.  The Court and the parties agree on the inestimable value of an education,

including at the elementary school level.  That goal has been impeded for these

three children by their nonattendance in classes for weeks before this action was filed.  At the Court's urging, and with the help of volunteers, the children have been transported to and from school while this matter is litigated.[1]  That a court had to be the driving force behind these arrangements illustrates the frustration of this case.  Sometimes it takes time to understand the underlying issues in litigation.  It took two evidentiary hearings, and multiple legal submissions, for the Court to discover what is really impeding the children's access to their elementary school.

## II.    FINDINGS OF FACT

### A.    Introduction

The Court is required to make specific findings of fact in this action because Plaintiffs' claims for injunctive relief were tried without a jury.  See Fed. R. Civ. P. 52(a); United States v. Lopez, 466 F. App'x 829, 831 (11th Cir. 2012).[2]  Having carefully "weigh[ed] and appraise[d]" the evidence in the record, including the credibility of those who testified at the evidentiary hearings, the Court states its factual findings below.  9C Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2576

---

[1]    The Court is grateful to Five Star Express Transit, James Wood and Melvin Jackson for their efforts to transport the plaintiff children to school.

[2]    "[T]he court need only make brief, definite, pertinent findings and conclusions upon the contested matters.  Rule 52(a) does not require a finding on every contention raised by the parties."  Wachovia Bank N.A., Nat. Ass'n v. Tien, 598 F. App'x 613, 617 (11th Cir. 2014) (citations and internal quotation marks omitted).

(3d ed. Apr. 2016 Update) ("[T]he district court must weigh and appraise the evidence offered by both parties impartially.").

   B.   <u>The Parties</u>

   Defendant Atlanta Independent School System ("APS") is a public school system in Atlanta, Georgia.  APS has jurisdiction over approximately 50,000 students and 100 schools, including Continental Colony Elementary School ("Continental Colony"), where Plaintiffs R.D., R.D. and D.T. (the "Children" or "Plaintiff Children") are enrolled.  (Transcript of October 13, 2016 Hearing on Temporary Restraining Order ("2016 Tr.") at 8-9, 50; Transcript of January 5, 2017 Hearing on Preliminary and Permanent Injunction [32] ("2017 Tr.") at 133.[3]  Defendant Meria Joel Carstarphen ("Superintendent Carstarphen") is the Superintendent of APS.  (2017 Tr. at 158).

   Ms. Todd is thirty-seven (37) years old.  (2016 Tr. at 7).  In 2002, she was diagnosed with retinal detachment.  (2016 Tr. at 10).  In 2007, she lost sight in her

---

[3]    The parties agreed to a consolidated hearing on January 5, 2017, to address Plaintiffs' requests for preliminary and permanent injunctive relief.  ([11] at 2 & n.1; [15]); cf. <u>FN Herstal SA v. Clyde Armory Inc.</u>, 838 F.3d 1071, 1088 (11th Cir. 2016) ("[A] right to a jury trial does not exist for suits seeking only injunctive relief, which is purely equitable in nature."); <u>West v. Dyncorp</u>, No. 04-14536, 2005 WL 1939445, at *1-2 (11th Cir. Aug. 15, 2005) (finding that plaintiff consented to a bench trial, even though his complaint demanded a trial by jury, because he "participated in the . . . fact-finding proceedings without objection").

right eye.  (2016 Tr. at 10-11).  On June 3, 2013, she lost sight in her left eye, and

now is blind.  (2016 Tr. at 11; 2017 Tr. at 16).  Ms. Todd is a single mother with

full custody of her four youngest children:  D.D., who is fourteen (14) years old,

Plaintiff R.D., who is nine (9) years old, Plaintiff R.D., who is eight (8) years old,

and Plaintiff D.T., who is five (5) years old.  (2016 Tr. at 8).  Roger Dennison

("Dennison") is the father of D.D., R.D. and R.D.  (2017 Tr. at 36).  Ms. Todd's

youngest child, D.T., has a different father.  (2017 Tr. at 36).  The Plaintiff

Children are not disabled.  (2017 Tr. at 56).  Ms. Todd also has a daughter, aged

twenty-one (21), who lives in Atlanta and who has three children of her own.

(2017 Tr. at 37, 42).  Ms. Todd has eight brothers and sisters, with whom she is not

on speaking terms, and a sixty-nine (69) year old aunt who visits her once a week.

(2016 Tr. at 17; 2017 Tr. at 33-34).[4]  Both of Ms. Todd's parents are deceased.

(2017 Tr. at 33).  Ms. Todd is the only adult who lives in her home.  (2016 Tr. at

17).

     Ms. Todd is unemployed and receives food stamps under the Supplemental

Nutrition Assistance Program, free housing and utilities under Section 8 of the

Housing Act of 1937, and approximately $737 per month in Social Security

disability benefits.  (2016 Tr. at 10, 21-22).  Her food stamps cover the cost of the

---

[4]    Ms. Todd's aunt is blind in one eye.  (2017 Tr. at 33).

groceries that she buys.  (2016 Tr. at 22).  Although Ms. Todd obtained court orders requiring Dennison and D.T.'s father to provide her with monthly child support payments of $384 and $116, respectively, she has not received payments from either individual.  (2017 Tr. at 35-36).  Ms. Todd claims she has sought, unsuccessfully, to enforce the court orders against the children's fathers.  (2017 Tr. at 36-37).

Ms. Todd states that, because of her blindness, she is "currently unable to walk [outside her home] without an accompanying individual holding her arm as a guide."  ([3.2] at 1; see 2017 Tr. at 24).  She has not learned to walk with the assistance of a walking cane or a guide dog.  (See 2016 Tr. at 20).  Ms. Todd generally uses her children as guides when she walks outside her home,[5] or uses MARTA Mobility, a door-to-door transportation service.[6]  (2016 Tr. at 13, 15; 2017 Tr. at 24).  She walks with D.D. and the Children to the grocery store at the top of her street.  (2016 Tr. at 13).  She allows D.D. and one of the Plaintiff Children to walk to the store together without adult supervision.  (2017 Tr.

---

[5]    This is illustrated in a Fox 5 news report of the first hearing in this case.  See Portia Bruner, Blind Mother Battles Atlanta Public Schools, FOX 5 ATLANTA (Oct. 13, 2016), http://www.fox5atlanta.com/news/211482439-story.

[6]    MARTA Mobility charges, for a one-way trip, $4.00 per adult passenger and $2.00 per child passenger.  One of Ms. Todd's children rides for free because of her age, and another rides for free as a caregiver.  (See 2016 Tr. at 14).

at 38-40).[7]  The grocery store is about the same distance from her home as

Continental Colony.  She cooks for her children and walks independently in her

home.  (2017 Tr. at 23-24).

Ms. Todd has always distrusted strangers.  (See 2017 Tr. at 17 ("[W]hen I

could see, I didn't trust strangers.")).  This distrust intensified after she lost her

sight because she "can't see the wrong moves that [others] are making or their

eyes."  (2017 Tr. at 17).  She believes "[p]eople are not right," "[t]he world is

strangers," and "[e]verywhere in the world is getting dangerous."  (2017 Tr. at 22,

30, 69, 75, 81).  She has taught her children to "scream, holler, kick [and] bite" if

"anybody touches [them]."  (2017 Tr. at 72-73).  Ms. Todd and her children do not

leave their home for entertainment or social activities, including because she

"cannot see if somebody is putting something in [her] Coca-Cola or [her] water."

(2016 Tr. at 14; 2017 Tr. at 40).  She generally does not allow her children outside

of her range of hearing, including to play or interact with other children in their

neighborhood.  (2016 Tr. at 16-17).  She "ha[s] to hear [her children] in order for

[her] to feel safety."  (2016 Tr. at 16).  In her old neighborhood, she allowed other

children to come to her home to play with her children, but she did not allow her

---

[7]      Plaintiff appears to rotate which of the Children she allows to walk to the
store with D.D.  (See 2017 Tr. at 38, 40).  She allows only one of the Children at a
time, usually her eight-year-old son, to walk with D.D.  (See 2017 Tr. at 38, 40).

children to go to others' homes because she feared for the safety of her children and "didn't want everybody to know [she] was blind, to be vulnerable . . . to different crimes." (2016 Tr. at 16-17).

### C.   APS Transportation Policy

APS provides transportation, to and from elementary schools, for students who live more than one mile away from school. (2017 Tr. at 124; [31.1] at 3; [6.1] ¶ 4).[8] Students who live within one mile of their elementary school live in what is known as the "walk zone." (2017 Tr. at 124; [31.1] at 3; [6.1] ¶ 4). Students in the walk zone do not receive APS transportation unless they are disabled or the walk zone is unsafe because of local crime, "unsafe walking conditions, traffic density patterns, things of that nature." (2017 Tr. at 127; [6.1] ¶¶ 4, 7).[9] Approximately 200 bus stops have been established inside APS walk zones to accommodate

---

[8]   This policy is based, in part, on O.C.G.A. § 20-2-188(d), which provides that "[s]tudents who live beyond one and one-half miles from the school to which they are assigned, according to the nearest practical route by school bus, shall be eligible to be counted as transported students for the purpose of calculating that portion of the expense of student transportation associated with transporting students from home to school and from school to home. . . . Any student who resides within such mileage limitation shall not be eligible to be counted for school transportation state-aid purposes, with the exception of disabled students being transported." O.C.G.A. § 20-2-188(d); (see [6.1] ¶ 4). APS provides transportation for high school or middle school students who live more than one and a half miles away from school. (2017 Tr. at 124; [31.1] at 3).

[9]   APS also provides transportation for homeless students, "as required by federal law." ([31.1] at 3).

disabled students or because of unsafe walking conditions.  (2017 Tr. at 128).

"Bus stops can be up to ½ mile apart and students could be required to walk up to

¼ mile to the nearest bus stop."  ([31.1] at 22).

      If a student is disabled, APS convenes an Individual Education Plan

Committee "to evaluate the student's disability and all aspects of their educational

process."  (2017 Tr. at 128; see [26.1] at 10 ("[W]e'll try to figure out what we

need to do to get the [disabled] kid to school.")).  At the request of the Committee,

the Transportation Department may provide transportation, to and from school, for

the disabled child.  (2017 Tr. at 128).  The Transportation Department also inspects

any walk zone about which there are safety concerns.  (2017 Tr. at 127).  A

walking path is deemed safe only if it is off the street, reasonably unobstructed,

and at least four feet wide.  (2017 Tr. at 127, 158-159; [27.1] at 40).[10]  The path

must not require the children to "walk right next to the road" or to "intermittently

walk out on the street."  (2017 Tr. at 159).  Concrete sidewalks are not required.

(2017 Tr. at 158-159).  It is "very usual," and "in step with the community sense,"

for children to walk across people's yards on their way to school.  (2017 Tr.

---

[10]    Plaintiffs moved, at the 2017 hearing, to admit into evidence the deposition testimony [27.1] of John Franklin, APS's Executive Director of Transportation. (2017 Tr. at 156).  On January 13, 2017, Defendants informed the Court, by email, that they have no objections to this request.  John Franklin's deposition testimony [27.1] is thus admitted into evidence.

at 159).  Although APS's Transportation Executive Director frequently receives transportation requests, he has never received a safety-based transportation request from parents of students who live in the Continental Colony walk zone.  (2017 Tr. at 131-132, 151).

When a parent seeks bus services for a student not eligible for APS transportation, the Transportation Department "explore[s] the supports that are available within the family."  ([31.1] at 30).  If this does not resolve the parent's concerns, the Transportation Department discusses the transportation request with the school principal and the school social worker.  ([31.1] at 30).  The school social worker contacts the parent, assesses the situation, makes "recommendations to the parent for support," and may "provide community supports."  ([31.1] at 30; 2017 Tr. at 155-156).  "[W]hatever barriers it is that causes the child not to come to school, . . . one of [the social worker's] jobs is to undo that barrier."  ([26.1] at 9).  The social worker may, for example, coordinate a "walking group" comprised of other students in the area who walk to school.  (2017 Tr. at 132).  APS schools also offer "a number of before- and after-school care programs which help parents to deliver kids early or pick them up later."  (2017 Tr. at 161).[11]

---

[11]  These procedures have been "in place" for some time but were "formalized" in November 2016.  (2017 Tr. at 154).

"APS does not have a policy or procedure stating that students of certain ages may be too young to walk to school unattended by an adult." ([6.1] ¶ 5; see 2017 Tr. at 130).[12]  It is not uncommon for older students, in the fourth or fifth grade, to walk a younger sibling to school, even where the younger sibling is in pre-kindergarten.  (2017 Tr. at 161).

D.    Plaintiffs' Request for Transportation to and from Continental Colony

In October 2014, when Plaintiffs lived on Sandys Lane SE in Atlanta, Ms. Todd enrolled her children at Humphries Elementary School.  (2017 Tr. at 44). Although Plaintiffs lived in the school's walk zone, APS provided Ms. Todd's children—and other children in the area—with transportation to and from school because the Transportation Department deemed the walking path unsafe.  (2017 Tr. at 130; [6.1] ¶ 8).  The walking path in Plaintiffs' old neighborhood required

---

[12]    APS's Bus Stop Safety Procedures state that "[t]he parent or designee must accompany their student(s) at the bus stop at drop-off and pick-up for students eight years old and younger."  ([31.1] at 22; see [6.1] ¶ 5; 2017 Tr. at 139-141). This policy is based on Georgia's Division of Family and Children Services guidelines, which state that children aged eight years old or younger "[s]hould never be left alone, even for short periods of time" and that, "[b]ased on [their] level of maturity," children between nine and twelve years old may be "left at home for brief periods of time."  ([31.1] at 22; 2017 Tr. at 140-141).  APS allows children under nine (9) years old to be accompanied by an older sibling, instead of an adult, when being picked up or dropped off at a bus stop.  ([6.1] ¶ 5).

students to cross a four-lane highway to get to school, and there was an "extreme density pattern of traffic."  (2017 Tr. at 130).

In the spring of 2016, Plaintiffs moved to their current residence, a two-story house with four bedrooms and a large yard, on The Fontainebleau SW in Atlanta. (2016 Tr. at 17-18; 2017 Tr. at 25).  Plaintiffs' home is in a residential neighborhood of single family homes with large front yards that border the road. (See [31]).[13]  Plaintiffs' move to their new neighborhood resulted in a change in the schools to which Ms. Todd's children were assigned.  D.D. is now in ninth grade and attends Therrell High School.  (2016 Tr. at 8).  R.D., R.D. and D.T. are enrolled in Continental Colony, where R.D. is in fourth grade, R.D. is in third grade, and D.T. is in pre-kindergarten.  (2016 Tr. at 8-9).

Plaintiffs' home is four tenths (0.4) of a mile, or a ten (10) minute walk, from Continental Colony.  (2017 Tr. at 126).[14]  Two tenths (0.2) of a mile of this

---

[13]    Pictures of Plaintiffs' home and neighborhood are attached as exhibits to this Order.  Exhibits 1 and 2 were presented to the Court during the 2016 hearing. Exhibit 3 was admitted into evidence during the 2017 hearing.  The exhibits are photographs showing the characteristics of The Fontainebleau SW, and the homes along it, between Plaintiffs' home and Hogan Road SW.

[14]    At the 2017 evidentiary hearing, APS's Executive Director of Transportation stated that "[i]f my memory serves me correctly, I think [the distance from Plaintiffs' home to Continental Colony is] six-tenths of a mile. . . .  It is definitely under one mile."  (2017 Tr. at 129).  Other materials in the record state that the distance is "½-mile" or "about .5 miles."  (See Compl. ¶ 31; [3.2] at 2).  Given this

walk is along Plaintiffs' street, which does not have a concrete sidewalk.  There are no obstructions in the yards along this street that would impede the Children's walk to school or that would cause them to step onto the street.  (See [31]; 2017 Tr. at 129, 158-159; [27.1] at 48).  The other two tenths (0.2) of a mile is on Hogan Road SW, which has a sidewalk.  (2017 Tr. at 97).  Continental Colony is located on Hogan Road SW.  (2016 Tr. at 25; 2017 Tr. at 96).  The walk from Plaintiffs' home to the school requires Plaintiffs to cross one interior neighborhood residential street.[15]  Classes at Continental Colony begin at 8:00 a.m. and end at 2:30 p.m. (2017 Tr. at 41-42).

In the summer of 2016, Ms. Todd visited Continental Colony to register and enroll her Children.  (2017 Tr. at 25).  On the first day of school,

---

uncertainty, the Court used Google Maps to determine the exact distance.  The Court also used Google Maps to calculate other distances noted in this Order.  See Jeffrey Bellin & Andrew Guthrie Ferguson, Trial by Google: Judicial Notice in the Information Age, 108 Nw. U. L. Rev. 1137, 1162 (2014) ("Probably the most common online source of judicially noticed facts is Google Maps. . . .  Courts often rely on Google Maps to establish the distance between two geographic points . . . referenced in the litigation."); see, e.g., McCormack v. Hiedeman, 694 F.3d 1004, 1008 n.1 (9th Cir. 2012) (taking judicial notice of Google Maps to determine the distance from an Idaho location to a Utah location); United States v. Proch, 637 F.3d 1262, 1266 n.1 (11th Cir. 2011) (taking judicial notice of a map).

[15]     The Court obtained this information from Google Maps.  The residential cross-street is called Sorrento Circle SW.

August 3, 2016,[16] Dennison walked Ms. Todd and the Children to school.  (2017

Tr. at 25).  When they arrived, Ms. Todd told school officials that she recently

moved into the area, and asked them about the school bus route in her

neighborhood.  (2017 Tr. at 26).  The officials replied that they would look into the

bus routes, which were not yet on the computer.  (2017 Tr. at 26).  The next day,

Dr. Kristen Vaughn, Continental Colony's Principal, told Ms. Todd her Children

were not eligible for bus services because they lived in the school's walk zone.

(2017 Tr. at 26).  Ms. Todd told Principal Vaughn she was blind and "d[id]n't have

anyone to help" her get the Children to school.  (2017 Tr. at 26).  Principal Vaughn

asked Dennison, R.D.'s and R.D.'s father, if he could take the Children to school.

(2017 Tr. at 26).  He said he could not.  (2017 Tr. at 26).[17]  Principal Vaughn said

she would raise Ms. Todd's concern with the APS Transportation Department.

(2017 Tr. at 26).  Later that day, Principal Vaughn told Ms. Todd that APS would

not provide her Children with transportation because they lived in the walk zone.

(2017 Tr. at 27).

---

[16]    Although Ms. Todd testified that the first day of school was August 4, 2016,
other evidence shows—and Plaintiffs' Complaint alleges—that August 3, 2016,
was the first day of school at Continental Colony.  (See Compl. ¶ 35; [27.1] at 80).
[17]    Plaintiffs have not introduced evidence explaining why Dennison cannot
take the children to school.

Ms. Todd's Children continued to attend Continental Colony through August 8, 2016. (2017 Tr. at 27).[18]  From August 9, 2016, through October 14, 2016, the Children did not attend school because Ms. Todd believes it is too dangerous for them to walk to school without adult supervision, and she "does not have other family members or trusted friends who are available to walk her children to school in her stead." ([3.2] at 1; 2016 Tr. at 27; 2017 Tr. at 27). Ms. Todd claims further that she does not have the resources to pay to transport her Children to and from school. (2016 Tr. at 20-21).  No evidence of the cost for Ms. Todd to transport her Children was introduced at the hearings.

In early August 2016, Ms. Todd discussed her transportation concerns with Associate Superintendent Tommy Usher. (2017 Tr. at 27, 125).  On August 16, 2016, she met with Rodney Harleston ("Harleston"), an APS social worker. ([26.1] at 20; 2017 Tr. at 125, 132; see 2017 Tr. at 148).  Neither discussion resolved Ms. Todd's concerns.  Ms. Todd then spoke with John Franklin ("Franklin"), APS's Transportation Executive Director. (2017 Tr. at 27, 124, 126).  She told him she was blind, and requested bus service to and from

---

[18]     Plaintiffs allege, but have not introduced evidence showing, that Dennison took the Children to and from school during this period. (Compl. ¶ 39).

14

school for her Children.  (2017 Tr. at 126; [27.1] at 31).  Franklin told her he would evaluate her request and get back to her.  (2017 Tr. at 126).

Franklin and Commander Carroll Patrick ("Patrick"), an APS safety and security officer, conducted an on-site inspection of Plaintiffs' walking path to school.  (2017 Tr. at 144).[19]  The inspection occurred at 2:30 p.m., when Continental Colony classes end for the day.  (2017 Tr. at 145).  Franklin and Patrick drove from the school to Ms. Todd's home, and from Ms. Todd's home back to the school.  (2017 Tr. at 144-145).  They "look[ed] at the various aspects in between [Ms. Todd's] residence and the school to determine if it can be walked reasonably."  (2017 Tr. at 126).  APS's Assistant Transportation Supervisor, Chief Operations Officer, and Chief of Schools and Academics also inspected the route to school from Plaintiffs' home.  ([27.1] at 46-47).  At least one of these inspections occurred in the morning.  ([27.1] at 46).  APS officials unanimously concluded "it was a reasonable walk path from [Plaintiffs'] residence of record to the school."  (2017 Tr. at 126, 129).

Franklin told Ms. Todd that APS would not provide a bus for the Children because Plaintiffs live in the walk zone and the walking path is safe.  (2017 Tr. at

---

[19]    Franklin "frequently" inspects walking routes for students who live in APS walk zones.  (2017 Tr. at 127).

126).  Franklin offered to walk Ms. Todd's Children to and from school, for a limited time, to help them get acquainted with other students walking in the same direction.  ([27.1] at 66).  Ms. Todd declined the offer, withheld her Children from school, and "made it very clear that she was going to advocate any level through the media that she needed to."  ([27.1] at 66, 81).  Franklin directed the APS Division of Student Services to "reach out to Ms. Todd, do a home visit, assess . . . the severity of her health condition . . . and those type of aspects," and look for "family or community supports" to resolve Ms. Todd's concerns and ensure her Children got to school.  (2017 Tr. at 148; [27.1] at 60).  These efforts did not result in a resolution.  On August 22, 2016, Ms. Todd sought legal representation by the Atlanta Legal Aid Society, Inc.  (2017 Tr. at 28).

  E. <u>Plaintiffs' Negotiations with APS</u>

On September 6, 2016, Ms. Todd's counsel sent a formal letter to Superintendent Carstarphen, asserting that Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973, required APS to "make a reasonable accommodation for Ms. Todd by providing transportation to pick up Ms. Todd's children in front of her house . . . and to bring them home from school in the afternoon."  ([3.2] at 2).  Ms. Todd's counsel suggested a "slight alteration" to an existing school bus route "or some other

vehicle arrangement." ([3.2] at 2).  The suggested adjustment to the bus route would cost APS $200 per year.  (2017 Tr. at 148, 151).

In a September 14, 2016, telephone conversation with Plaintiffs' counsel, APS proposed a "walking pool" to get the Children to and from school.  ([3.5] at 1-2; 2016 Tr. at 19).  APS also referred Ms. Todd to Garrick Scott, President of the Georgia Office of the National Federation of the Blind.  (2016 Tr. at 19). Mr. Scott offered to teach Ms. Todd to walk with a walking cane.  (2016 Tr. at 20). Ms. Todd believed the lessons would take "months," and felt that she needed to stay at home with her Children.  (2016 Tr. at 20).  Ms. Todd declined Mr. Scott's offer and apparently is still not receiving the instruction, even though her Children have been taken to school by transportation volunteers since October 17, 2016. (2016 Tr. at 20).[20]

On September 19, 2016, counsel for Ms. Todd emailed APS, stating that the proposed walking pool was not "a reasonable alternative to APS-provided or

---

[20]   In January 2015, Ms. Todd applied for training at the Center for the Visually Impaired ("CVI").  (2017 Tr. at 20).  She claims the processing of her application was "hindered" when her previous home flooded.  (2017 Tr. at 20).  She apparently did not receive any CVI training after she moved to her current home in 2016. (2017 Tr. at 20).  She testified that she is "unable to learn when I don't know if my children are going to school today or who are going to take my children to school. I can't learn in confusion."  (2017 Tr. at 20).  She did not take CVI classes from October 17, 2016, through December 2016, when a private transportation company voluntarily drove her Children to and from school each day.  (2017 Tr. at 20).

subsidized vehicle transportation," but that Ms. Todd was willing to meet with the walking pool chaperone.  ([3.4]).

On September 22, 2016, counsel for Ms. Todd sent APS a follow-up letter, requesting clarification about, and assistance in organizing, the walking pool arrangement.  ([3.5]).[21]  Counsel for Ms. Todd stated in the letter that "Ms. Todd is reluctantly willing to consider the walking pool as a temporary solution only in order to get her children back in school immediately while the final resolution of this matter is pending."  ([3.5] at 1).

On September 28, 2016, Harleston told Ms. Todd and her counsel that the walking pool would include two children in the fourth or fifth grade, but not an adult chaperone.  ([3.6] at 1; 2016 Tr. at 19; 2017 Tr. at 29; [26.1] at 32).  Counsel for Ms. Todd replied that Ms. Todd was not comfortable with this proposal, that it was not a "reasonable accommodation," and that Ms. Todd required "school-sponsored services to safely accompany her children, on foot or by car, to

---

[21]   The September 22, 2016, letter also stated that APS had sent Ms. Todd two letters "threatening her with violations of Georgia's Compulsory School Attendance Law" and "stat[ing] that she may be fined $100 and imprisoned for up to 30 days for each day of her children's absence."  ([3.5] at 2; see also [26.1] at 4-5).  Harleston sent Ms. Todd the first letter on August 17, 2016, explaining Georgia's Compulsory School Attendance Law and noting that Ms. Todd's children had incurred three or more unexcused absences from school.  ([26.1] at 19-21).  The second letter was sent to Ms. Todd on August 24, 2016.  ([26.1] at 25).

the school from her house on a daily basis."  ([3.6] at 1).  Ms. Todd testified that

she was "never" open to the walking pool suggestion, even if it included an adult

chaperone, because she was worried about the safety of her Children and because

"a volunteer is just a volunteer."  (2017 Tr. at 32-33).[22]

F.    Procedural History

On October 6, 2016, Plaintiffs filed their Complaint and Request for

Injunctive Relief [1] ("Complaint"), asserting claims under Title II of the ADA,

42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.

§ 794.  Plaintiffs claim that Defendants have failed to reasonably accommodate

Ms. Todd's disability and that this failure has excluded her Children from school,

in violation of the ADA and Rehabilitation Act.  The Complaint requests

"declaratory and injunctive relief to permanently require Defendant to provide

daily school-sponsored services to safely accompany the minor Plaintiffs, on foot

or by vehicle, to the school from their house."  (Compl. at 19).  On

October 6, 2016, Plaintiffs also filed their Emergency Motion for Temporary

Restraining Order and Preliminary Injunction [3], seeking an order requiring APS

to "provide bus transportation to and from school immediately . . . [and] through

---

[22]    Ms. Todd stated the chaperone "might want to walk me on the other side of
the street . . .where it's much more dangerous."  (2017 Tr. at 29-30).

the pendency of this action."  ([3] at 2).  On October 13, 2016, the Court held a

hearing on Plaintiffs' request for a temporary restraining order.  ([9]).

On October 17, 2016, Plaintiffs notified the Court that Five Star Express

Transit ("Five Star"), a private-transportation company, volunteered to take

Ms. Todd's Children to and from school "until at least the end of the Fall

Semester."  ([10] at 2).  In light of this development, on October 18, 2016, the

Court denied as moot Plaintiffs' emergency request for a temporary restraining

order.  Five Star drove Ms. Todd's Children to and from school from

October 17, 2016, through December 2016.  (2017 Tr. at 49-50, 58-59).  The

Children did not miss any days of school during this period.  (2017 Tr. at 50).

Ms. Todd did not meet, and otherwise did not know, the Five Star drivers before

they began driving her Children to school.  (2017 Tr. at 61).

On January 3, 2017, Five Star told Ms. Todd it could no longer transport her

Children to and from school.  (2017 Tr. at 52).  That same day, a community

member, Harry Wallace ("Wallace"), offered, at no charge, to drive Ms. Todd's

Children to and from school.  (2017 Tr. at 62, 68; [33] at 16).[23]  Wallace drives his

---

[23]     Defendants initially believed a second community member, Jamilyne Lorme
("Lorme"), also had volunteered to take Ms. Todd's Children to and from school.
(Compare [33] at 16, with [34.2] ¶12).  In fact, Lorme, a former classmate of
Ms. Todd, had offered to help organize a fundraising campaign among their high

own child to and from Continental Colony every day.  ([33] at 16).  APS offered to conduct a background check on Wallace and on any second volunteer who may come forward.  (2017 Tr. at 68, 87).  Ms. Todd rejected the offer, and was unwilling to meet with Wallace, because she believes volunteers are unreliable and dangerous.  (See 2017 Tr. at 51, 68-70, 75-76, 83-85).  She is unwilling to accept a permanent arrangement involving community members, even if they commit to drive her Children to and from school "so long as [the Children] needed that." (2017 Tr. at 82).  She requires that her Children receive transportation only from an APS official whom she trusts after hugging them, talking with them, and "feel[ing] [their] soul."  (2017 Tr. at 71-72, 84-85; see also 2016 Tr. at 32).  If bus transportation was provided, she would need to hug the driver and feel his soul to determine if she could trust him.  If she did not trust the driver after going through this process, she would request a different bus driver and would not allow her Children to ride the bus until APS sent a new driver who was acceptable to her. (2017 Tr. at 71-72).

---

school class.  ([34.2] ¶¶ 7, 10).  Lorme's proposal is to "raise money that could be deposited into an Uber account for Ms. Todd."  ([34.2] ¶ 10).  Lorme currently works for a school that "is doing a similar fundraising effort to help children who live in our walk-zone and whose parents are unable to get them to school."  ([34.2] ¶ 11).

On January 5, 2017, the Court held a combined hearing on Plaintiffs' request for preliminary and permanent injunctive relief.  ([32]).  Ms. Todd's Children apparently did not attend school from January 4, 2017, through January 6, 2017.  (2017 Tr. at 51).[24]  On January 9 and January 10, 2017, the Children were driven to and from school by James Woods ("Woods"), a member of Ms. Todd's church.  ([34.1] at 1).  On January 11, 2017, Woods drove the Children to school and Melvin Jackson ("Jackson"), a former high school friend of Ms. Todd's, drove the Children home.  ([34.1] at 2).  This arrangement is expected to continue until the spring of 2017, when Woods states he will move to Indiana.  ([34.1] at 2).[25]

## III.  PLAINTIFFS' CLAIMS

### A.    Ms. Todd's Claim

Ms. Todd claims Defendants discriminated against her because of her disability, in violation of Title II of the ADA.  She states that her blindness prevents the Children from attending school because she is unable to take them herself, and the Children "have no other means to access school."  ([33] at 23, 25,

---

[24]    The Children were brought to the courthouse on the day of the January 5, 2017, hearing.  They sat in a side room until the hearing concluded.  Ms. Todd did not explain why the Children were brought to the courthouse rather than taken to school.

[25]    Jackson is not available to take the Children to school in the mornings.  ([34.1] at 2).

28-29; see [3.1] at 2).  She argues that Defendants are required to accommodate her disability by transporting her Children to and from school.  Ms. Todd claims that Defendants have failed to provide the transportation her Children require, and that this failure has denied her "the benefit of a public education for her children." ([33] at 23, 28).

    B.    The Children's Claims

    Plaintiffs R.D., R.D. and D.T., who are not disabled, assert claims for associational disability discrimination under Title II of the ADA.  They claim they cannot get to school without APS transportation because their mother is blind. They argue that, by failing to transport the Children to school, APS has denied them "the benefit of a free public education" and has discriminated against them because of their association with a disabled person.  ([33] at 30; see Compl. ¶¶ 74, 76, 91; [8] at 5).  Plaintiffs seek to enjoin the Defendants from failing to transport the Children to and from Continental Colony.[26]

---

[26]    Although Plaintiffs also assert claims under Section 504 of the Rehabilitation Act of 1973, their briefing addresses only their ADA claims. Subject to limited exceptions, "[d]iscrimination claims under the [Rehabilitation Act] are governed by the same standards used in ADA cases."  J.A.M. v. Nova Se. Univ., Inc., 646 F. App'x 921, 926 (11th Cir. 2016); (see [3.1] at 10 (stating that, subject to limited exceptions, the ADA and the Rehabilitation Act are "functionally identical"); [33] at 22 n.1 (same)).  The Court analyzes Plaintiffs' claims under the framework of the ADA, except where it is necessary to refer to the Rehabilitation

## IV.   LEGAL BACKGROUND

### A.   Legal Standard for Injunctive Relief

"[T]o obtain a permanent injunction, a party must show:  (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." Alabama v. U.S. Army Corps of Engineers, 424 F.3d 1117, 1128 (11th Cir. 2005).[27]  A permanent injunction is an "an extraordinary remedy," id. at 1127, and is issued only where the moving party establishes both "actual success on the merits," Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004) (internal quotation marks omitted), and an injury that is "actual and imminent" that cannot be "undone through monetary remedies," Ne. Florida Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir.

---

Act.  See Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1316 n.3 (11th Cir. 2009) ("Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, we discuss those claims together and rely on cases construing those statutes interchangeably.")

[27]    "A district court may grant [a preliminary injunction] only if the moving party shows that:  (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).

1990); see Chacon v. Granata, 515 F.2d 922, 925 (5th Cir. 1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable.");[28] Bhogaita v. Altamonte Heights Condo. Assn., Inc., No. 6:11-cv-1637, 2013 WL 2467782, at *2 (M.D. Fla. June 7, 2013) ("To obtain a permanent injunction, there must be some cognizable danger of recurrent violations or some continuing harm for which money damages are insufficient compensation.").

The party seeking a permanent injunction has the burden of proof to show "by a preponderance of the evidence that [the requested] form of equitable relief is necessary." Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1182 n.10 (11th Cir. 2007); see K.G. ex rel. Garrido v. Dudek, 981 F. Supp. 2d 1275, 1278 (S.D. Fla. 2013). Because a permanent injunction is "an extraordinary and drastic remedy," it "should not be granted unless the movant clearly carries the burden of persuasion." Wilson v. Broward Cty., Fla., No. 04-cv-61068, 2008 WL 708180, at *2 (S.D. Fla. Mar. 14, 2008) (internal quotation marks omitted) (quoting Canal Auth. of the State of Fla. v. Callaway, 489 F.2d 567, 573 (5th Cir. 1974)).

---

[28]    In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981.

B.    Background of the ADA

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1)-(2). "[T]he Act [is] broadly construed" to effectuate its remedial purposes. Kornblau v. Dade Cty., 86 F.3d 193, 194 (11th Cir. 1996).

The ADA is divided into three parts. Title I prohibits disability discrimination in employment. See 42 U.S.C. §§ 12111-12117. Title II prohibits disability discrimination in public services furnished by governmental entities. See 42 U.S.C. §§ 12131-12165.[29] Title III prohibits disability discrimination in public accommodations provided by private entities. See 42 U.S.C. §§ 12181-12189.

"Titles I, II, and III of the ADA do not contain neatly drawn parallel provisions; while Titles I and III list many specific actions that constitute discrimination, Title II simply provides a blanket prohibition on discrimination without listing any specific acts that are proscribed." A Helping Hand,

---

[29]    Part A of Title II governs public services generally, 42 U.S.C. §§ 12131-34, and Part B governs public transportation services specifically, 42 U.S.C. §§ 12141-65.

LLC v. Baltimore Cty., 515 F.3d 356, 363-64 (4th Cir. 2008); compare 42 U.S.C. § 12112(b) (Title I) and 42 U.S.C. § 12182(b) (Title III) with 42 U.S.C. § 12132 (Title II).  The ADA "direct[s] the Attorney General to issue regulations setting forth the forms of discrimination prohibited" under Title II.  Shotz v. City of Plantation, 344 F.3d 1161, 1179 n.26 (11th Cir. 2003) (citation and internal quotation marks omitted); see 42 U.S.C. § 1234.  The Attorney General has issued regulations, which "must be given legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute."  Shotz v. Cates, 256 F.3d 1077, 1079 n.2 (11th Cir. 2001) (brackets and internal quotation marks omitted) (quoting United States v. Morton, 467 U.S. 822, 834 (1984)).  "[T]he department's regulations are the agency's interpretation of the statute, and they are therefore given controlling weight unless they conflict with other departmental regulations or the ADA itself."  Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494, 506 (4th Cir. 2016) (citation and internal quotation marks omitted); see also Gaylor v. Georgia Dep't of Nat. Res., No. 2:11-cv-288, 2013 WL 4790158, at *4 (N.D. Ga. Sept. 6, 2013) ("[I]nsofar as those regulations validly and reasonably construe and implement the statutory mandate, they are enforceable in a private cause of action along with the statutes themselves.").

## V.     MS. TODD'S CLAIM OF DIRECT DISCRIMINATION

Ms. Todd claims Defendants discriminated against her by failing to transport her Children to school, because her disability prevents her from doing that herself. Ms. Todd acknowledges that she can walk the Children to and from school using the Children as her guide.  (See 2016 Tr. at 13; 2017 Tr. at 24-25).  Her issue is that she is unable to walk home after the Children are delivered to school, and unable to get to school to walk home with them.  (See 2016 Tr. at 20).  For these reasons, she claims Defendants are required to transport her Children as an accommodation for her disability.  (See, e.g., Compl. ¶ 1).  Ms. Todd brings her claim under Title II of the ADA.[30]

### A.     Overview of Title II

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

---

[30]     Plaintiffs' claims under 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(7) and 28 C.F.R. § 35.150 are each based on Defendants' alleged failure to reasonably accommodate Ms. Todd's disability.  (See, e.g., [3.1] at 16 (Plaintiffs assert:  "The school's failure to accommodate [under 28 C.F.R. § 35.130(b)(7)] also makes Defendant liable under [sections 12132 and 35.150].")).

> In order to state a Title II claim, a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

Bircoll v. Miami–Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007).[31]

The elements of a Title II claim may be further refined, depending on the discrimination theory on which the plaintiff relies. "A plaintiff can proceed on theories of intentional discrimination, disparate treatment, or failure to make reasonable accommodations." Rylee v. Chapman, 316 F. App'x 901, 906 (11th Cir. 2009); see Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 (11th Cir. 2008) (stating that the ADA "recognizes disparate treatment and reasonable accommodation theories"); see 28 C.F.R. § 35.130(b)(7).[32]  To establish a Title II

---

[31]    "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

[32]    28 C.F.R. § 35.130(b)(7) states that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  The parties do not challenge the validity of this regulation, and "the text of the statute

violation under a reasonable accommodation theory, as Ms. Todd seeks to do here,

a plaintiff must show (1) she is a qualified individual with a disability, (2) she is

unable, because of her disability, to meaningfully access a public benefit to which

she is entitled, and (3) the public entity failed, despite her request, to provide a

reasonable accommodation for her disability.[33]  See Nadler v. Harvey,

No. 06-12692, 2007 WL 2404705, at *5 (11th Cir. Aug. 24, 2007) ("If establishing

discrimination by failure to make reasonable accommodation, a plaintiff must

merely show that (1) he was disabled, (2) he was otherwise qualified, and (3) a

reasonable accommodation was not provided."); Kornblau, 86 F.3d at 196

("[T]o base a claim on the ADA, plaintiff must first show she was denied a public

benefit."); Redding v. Nova Se. Univ., Inc., 165 F. Supp. 3d 1274, 1299 (S.D. Fla.

---

itself clearly indicates that Title II includes a reasonable accommodation
requirement, and that the 'reasonable modifications' regulation is therefore within
the scope of the statutory mandate."  Gaylor, 2013 WL 4790158, at *5; see Owens
v. Sec'y, Florida Dep't of Corr., 602 F. App'x 475, 477 (11th Cir. 2015); Bircoll,
480 F.3d at 1082 n.13 ("interpret[ing] and apply[ing]" 28 C.F.R. § 35.130(b)(7)
where the parties did not challenge its validity); Wilf v. Bd. of Regents of the
Univ. Sys. of Ga., No. 1:09-cv-01877, 2012 WL 12888680, at *15 (N.D. Ga.
Oct. 15, 2012) (rejecting the argument that Title II does not permit reasonable
accommodation claims).

[33]      "In cases alleging a failure to make reasonable accommodations, the
defendant's duty to provide a reasonable accommodation is not triggered until the
plaintiff makes a specific demand for an accommodation."  Rylee, 316 F. App'x at
906.  A specific demand may be unnecessary where the need for an
accommodation is obvious.  Schwarz v. The Villages Charter Sch., Inc., 165
F. Supp. 3d 1153, 1173 (M.D. Fla. 2016).

2016) (stating that the Rehabilitation Act—and thus the ADA—"requires only

those accommodations that are necessary to ameliorate a disability's effect of

preventing meaningful access to the benefits of, or participation in, the program at

issue.").

"[A] failure to make reasonable accommodation claim requires no animus"

or "discriminatory motivation." Nadler, 2007 WL 2404705, at *4, 8.  A reasonable

accommodation may result in different treatment for a disabled person than a

nondisabled person.  Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1262-63

(11th Cir. 2007).

B.    Whether Ms. Todd is Unable, Because of Her Disability, to Access a
        Public Benefit to which She is Entitled[34]

The Court first considers whether Ms. Todd proved that she is unable,

because of her disability, to meaningfully access a benefit to which she is entitled.

1.    Legal Principles

To establish a Title II violation, a plaintiff must show that, because of her

disability, she lacks "meaningful access" to a public benefit to which she is

entitled.  Alexander v. Choate, 469 U.S. 287, 301 (1985) ("[A]n otherwise

qualified handicapped individual must be provided with meaningful access to the

---

[34]     The Court assumes, for the purposes of this Order, that Ms. Todd is a
qualified individual with a disability.

benefit that the grantee offers."); see Mason v. Corr. Med. Servs., Inc., 559 F.3d 880, 888 (8th Cir. 2009) ("To show a violation of Title II, [plaintiff] must specify a benefit to which he was denied meaningful access based on his disability."); accord CG v. Pennsylvania Dep't of Educ., 734 F.3d 229, 237 (3d Cir. 2013); Video Gaming Techs., Inc. v. Bureau of Gambling Control, 356 F. App'x 89, 94-95 (9th Cir. 2009); Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 907 (6th Cir. 2004).[35]

A plaintiff is not required to show they are "completely prevented from enjoying a service, program, or activity." Shotz, 256 F.3d at 1080; see Medina v. City of Cape Coral, 72 F. Supp. 3d 1274, 1279 (M.D. Fla. 2014) ("[A]n ADA violation does not occur solely when a disabled person is completely prevented from enjoying a program."). In Shotz, two disabled individuals sued Levy County, Florida, alleging "that the wheelchair ramps and bathrooms at the courthouses impeded their ability to attend trials at the courthouse." 256 F.3d at 1080. Although both plaintiffs attended a trial at the courthouse, the Eleventh Circuit found that they adequately stated a claim under Title II of the ADA. The

---

[35]     "[F]ew courts have explored how to define meaningful access or determine when a program provides or denies disabled people meaningful access to its benefit." Liberty Res., Inc. v. Philadelphia Hous. Auth., 528 F. Supp. 2d 553, 566 (E.D. Pa. 2007).

court stated: "If the Courthouse's wheelchair ramps are so steep that they impede a disabled person or if its bathrooms are unfit for the use of a disabled person, then it cannot be said that the trial is 'readily accessible,' regardless of whether the disabled person manages in some fashion to attend the trial." Id. at 1080.[36]

Difficulty in accessing a benefit, however, does not by itself establish a lack of meaningful access. In Bircoll, a police officer stopped a deaf motorist at 3 a.m. and administered four field sobriety tests on the roadside. 480 F.3d 1072. The motorist had difficulty communicating with the officer and, despite his request, was not provided with an oral interpreter. The motorist failed the sobriety tests and was arrested for driving under the influence of alcohol. He sued the officer's county for failure to reasonably accommodate his hearing impairment, in violation of Title II of the ADA. He claimed he was denied the benefit of "effective communication with the police" during his sobriety tests. Id. at 1085. The Eleventh Circuit dismissed plaintiff's claim because "the actual communication between [the officer] and [plaintiff] was not so ineffective that an oral interpreter was necessary. . . ." Id. at 1086. The Eleventh Circuit found that, although the

---

[36]     In reaching this conclusion, the Eleventh Circuit applied 29 C.F.R. § 35.150, a Title II regulation that states: "A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

communication was not "perfect," plaintiff "reads lips and usually understands fifty percent of what is said," "understood that he was being asked to perform field sobriety tests," and "actually tried to perform at least three of those tests." Id. at 1086. Plaintiff was not denied the benefit of effective communication, even though communication was more difficult for him because of his hearing impairment, and even though communication would have been easier for him— and more effective—if auxiliary aids had been provided.

In Ganstine v. Sec'y, Fla. Dep't of Corr., 502 F. App'x 905 (11th Cir. 2012), an inmate claimed he was discriminated against because he was unable to access areas of the prison in his wheelchair. The Eleventh Circuit held that the inmate was not denied meaningful access because, with the assistance of inmate orderlies, he could go "wherever he needed to go" "most of the time" Id. at 910. When the orderlies were unavailable, he could usually push himself to a destination, even though this took longer. Id. at *4; Ganstine v. Buss, No. 4:11-cv-88, 2011 WL 6780956, at *2 (N.D. Fla. Dec. 27, 2011). The inmate had meaningful access to the prison facilities even though his disability prevented him from *always* accessing the area in the prison where he wanted to go, and even though his access was sometimes delayed or otherwise inconvenienced by the need to push himself in his wheelchair.

2.    <u>Analysis</u>

Having carefully evaluated the evidence presented in this action, and the credibility of the witnesses, the Court finds Ms. Todd has not proved that her disability prevents her from accessing the public benefit to which she claims she is entitled.

As an initial matter, the Court finds Ms. Todd is not entitled to the public benefit she seeks.  Ms. Todd seeks "the benefit of a public education for her children."  ([33] at 23).[37]  Public education, however, is provided to students, not the parents of students.  "[I]t is the student—not his parents—who has a right to a free public education."  <u>Boster v. Philpot</u>, 645 F. Supp. 798, 807 (D. Kan. 1986) (citing <u>Goss v. Lopez</u>, 419 U.S. 565, 581 (1975)); <u>see</u> <u>Brian A. ex rel. Arthur A. v. Stroudsburg Area Sch. Dist.</u>, 141 F. Supp. 2d 502, 507 (M.D. Pa. 2001) ("The right to a free public education is a right which belongs to the student

---

[37]    Ms. Todd claims specifically that "[t]he failure to offer accommodation has denied [her] Children access to public education because of her disability."  ([33] at 28; <u>see also</u> [8] at 2 ("Ms. Todd's standing is based on the injury she has suffered as a result of being denied the ability to send her children to school, a right to which she is entitled by virtue of Georgia's compulsory education statute."); [33] at 24-25 ("Ms. Todd seeks reasonable accommodation to comply with" her statutory duty to "enroll and send her children to school"); 2016 Tr. at 37-38 ("[I]t's not about transportation . . . .  That's one of the things we need to make clear is that this is about access, and transportation is one means, but they could provide other accommodations."))

and not their parents."); <u>Wells v. Banks</u>, 266 S.E.2d 270, 272 (Ga. Ct. App. 1980)

("[H]aving extended to all children in Georgia the right to an education, the state

cannot arbitrarily withdraw that right.").  Ms. Todd cannot circumvent the ADA's

requirements by somehow combining her protected status as a disabled person with

her Children's personal right to an education.  Ms. Todd's claim fails because she

has not shown she is entitled to the public benefit she seeks.  <u>See</u> <u>Wright v. N.Y.</u>

<u>State Dep't of Corr.</u>, 831 F.3d 64, 72 (2d Cir. 2016) (stating that a disabled

plaintiff must show "as a practical matter [he or she] was denied meaningful access

to services, programs or activities *to which he or she was legally entitled*"

(emphasis added) (internal quotation marks omitted)).[38]

     Even if Ms. Todd was entitled to an education for her Children, she has not

shown she was denied meaningful access to this benefit.  Ms. Todd has proved, at

most, that she is unable to walk the Children personally to and from school.[39]  The

---

[38]    To the extent Ms. Todd frames her claimed benefit as "a means of transportation for her children to get to school," (<u>see, e.g.</u>, [33] at 23; [3] at 14), she fails—even more clearly—to establish her entitlement to the benefit she seeks.

[39]    Even this limited conclusion is subject to caveats.  The evidence shows that Ms. Todd can walk with her Children to school if she believes that is necessary, and that she can do so in the same manner that she walks with them in other out-of-the-home environments.  (<u>See, e.g.</u>, 2016 Tr. at 13).  Ms. Todd's real problem is walking home by herself after dropping the Children off at school, and then walking to school by herself to pick up the Children in the afternoon.  Plaintiffs do

unavailability of this method of getting the Children to school does not, by itself, establish that the Children lack meaningful access to school.  Cf. Ganstine, 502 F. App'x at 910; Bircoll, 480 F.3d at 1085-86.  Many parents are unable to walk their children to and from school every day.  There are any number of other ways to get a child to school, including making arrangements for the child to walk to school independently, or seeking assistance from others such as family, friends, community members, charities or even taxi services.[40]  Ms. Todd has not shown she has meaningfully explored these options or that they are unavailable to her. She has, for example, benefitted from the assistance of volunteers and community members since the first evidentiary hearing in this case.  She has repeatedly refused help, arranged by APS, from other community members.  She has unequivocally stated that she is unwilling to allow anyone, other than an APS official who she personally approves, to take her Children to and from school.  She has further stated that she requires door-to-door transportation for all of the Children, despite their age or grade.  Even assuming Ms. Todd cannot personally

---

not argue that the ADA requires Defendants to provide transportation for Ms. Todd to get to and from school.

[40]     There is no evidence, beyond her own unsupported statement, that Ms. Todd cannot afford to pay for transportation for her Children to and from school.  She receives $737 per month in discretionary income, and her housing, utilities and food are paid for by the Government.  (2016 Tr. at 10, 21-22).

walk her Children to and from Continental Colony, she has not met her burden to prove the Children are unable to attend school.

The evidence in the record shows affirmatively that the Children have reasonable, safe access to the education offered at Continental Colony because they, like other students in the school walk zone, including those of the Children's age, can reasonably walk to school by themselves. Plaintiffs live four tenths (0.4) of a mile from Continental Colony. There is a sidewalk for two tenths (0.2) of a mile of this distance. Other young children use this sidewalk to walk to school unaccompanied by adults.[41] The remaining two tenths (0.2) of a mile is along the single family residential street where Plaintiffs live. This street has large front yards that border the road. There is a reasonably large, unobstructed walking path along these yards, which the Children can use without even walking close to the road. It is "very usual," and "in step with the community sense," for children to walk across people's lawns on their way to school. (2017 Tr. at 159). The walk to and from school can always be done in daylight because the walk takes ten (10)

---

[41]    On the morning of October 13, 2016, Ms. Todd's counsel visited Continental Colony before the school day began. They observed three children walking to school: one crossed the street from a home, and two children, ages eight (8) and ten (10), walked alone on Hogan Road SW to the school. (2016 Tr. at 25). Children also were dropped off at the school by their parents in cars. (2016 Tr. at 25).

minutes, classes begin at 8 a.m., and there is sufficient ambient daylight before the

sun is astronomically deemed to have risen.[42]  It appears there are speed bumps on

the road, and road signs warning drivers to beware of school children in the area.

(See [31] at 6).[43]  The Children already have significant experience in navigating

Plaintiffs' street because they routinely walk to the grocery store with their mother

or their fourteen-year-old brother, D.D.

The walk to and from school requires Ms. Todd's Children to cross only one

residential street that is in the interior of the neighborhood.  There is no evidence

---

[42]     The sun rises in Atlanta more than 10 minutes before 8 a.m.  The latest that
the sun rose in Atlanta, in 2016, was 7:43 a.m.  See Astronomical Applications
Dept. U.S. Naval Observatory, Rise and Set for the Sun for 2016:  Atlanta,
Georgia, http://aa.usno.navy.mil/cgi-bin/aa_rstablew.pl?ID=AA&year=2016&task
=0&state=GA&place=atlanta.  Sunrise and sunset are defined as when the sun
appears above, or disappears from, the horizon.  See Merriam-Webster's Collegiate
Dictionary 1252 (11th ed.).  The Court takes judicial notice that there is significant
ambient light well before the sun "officially" rises and sets.  The Court confirmed
this on several occasions after the last hearing in this case.  There also are street
lights on Plaintiffs' street, although they are not needed during the hours required
for the Children to walk to and from school.  (See [31] at 5-6).
[43]     The Court used images from Google Maps to confirm its interpretation of
Plaintiffs' pictures of The Fontainebleau SW.  See United States v. Brown, 636 F.
Supp. 2d 1116, 1124 n.1 (D. Nev. 2009) ("Courts have generally taken judicial
notice of facts gleaned from internet mapping tools such as Google Maps or
Mapquest."); see also Daniels v. 1710 Realty LLC, No. 10-cv-0022, 2011 WL
3648245, at *1 n.2 (E.D.N.Y. Aug. 17, 2011), aff'd, 497 F. App'x 137 (2d Cir.
2012) ("A Google Maps search of 1710 Union Street reveals that the commercial
units occupy the ground storey, and the residential units occupy the top three
storeys.").

of heavy traffic on this residential road.[44]  There is no evidence of any crime in

Plaintiffs' neighborhood.  APS's Transportation Executive Director has never

received a safety-based transportation request from parents of students who live in

the Continental Colony walk zone.  There is no evidence a child has been injured

walking to or from Continental Colony.  After several reviews, including onsite

inspections in the morning and afternoon, APS officials unanimously concluded

that Plaintiffs' walking path is safe.  Ms. Todd's Children, like others in the

Continental Colony walk zone, can reasonably walk to school by themselves.

Ms. Todd's only support for her argument that the Children "are too young

to walk without adult supervision" are portions of the guidelines (the "Guidelines")

issued by Georgia's Division of Family and Children Services ("DFCS"), and

---

[44]    Tameka Nicole Allen, a Five Star driver, testified that traffic can be "a little congested" at the intersection of The Fontainebleau SW and Hogan Road SW "because nobody yields at the yield."  (2017 Tr. at 98).  When pressed by Plaintiffs' counsel, she described the traffic along her driving route as "pretty heavy."  (2017 Tr. at 98).  Based on the Court's observation of Ms. Allen's testimony at the evidentiary hearing, the Court believes Ms. Allen's traffic evaluation referred primarily to the intersection of The Fontainebleau SW and Hogan Road SW.  Ms. Allen did not assert that traffic on the residential cross-street, or on The Fontainebleau SW generally, was heavy.  Even if she had, this would not render the walking path unsafe in light of the other evidence described in this section of the Order, including the unanimous view of several APS officials, who specifically inspected the route, that the walking path is safe. In view of the large front yards along The Fontainebleau SW, the Children are not required to walk close to the road, and, once on Hogan Road SW, the distance to school is short and there is a sidewalk on which they would walk.

APS's Bus Stop Safety Procedures.  ([33] at 25-26).  The Guidelines are general standards set by the DFCS, and do not refer specifically to the context of a child walking to and from school.  The Guidelines state that children aged eight years old or younger "[s]hould never be left alone, even for short periods of time" and that, "[b]ased on [their] level of maturity," children between nine and twelve years old may be "left at home for brief periods of time."  ([31.1] at 22; 2017 Tr. at 140).[45]  These general guidelines are not binding on the Court, and "Georgia does not have regulations or laws to determine when a child is considered old enough to be left unsupervised or to supervise other children."  DFCS, Make Sure Children have Supervision during Holidays (Nov. 25, 2008), http://dfcs.dhs.georgia.gov/ make-sure-children-have-supervision-during-holidays.  The Guidelines do not address the issues in this action because they were prepared, at least in part, to "determine if a child neglect investigation is warranted."  Id.  The Guidelines also appear to focus on the age at which it is appropriate to leave a child at home unsupervised, rather than the age at which children may walk to and from school without adult supervision.  If the Guidelines were applied in the expansive way Plaintiffs suggest, parents would be required to accompany—or find other adults to

---

[45]      The Court notes that neither of the Children under nine (9) years old are "left alone" in their walk to school, because they are accompanied by R.D., who is nine (9) years of age.

accompany—their children at all times, in all places, for the first eight years of their children's lives.  Plaintiffs' interpretation defies common sense, logic, and otherwise is inconsistent with how people manage life.[46]  Indeed, APS's Executive Director of Transportation testified that it is not uncommon for older students, in the fourth or fifth grade, to walk a younger sibling to school, even where the younger sibling is in pre-kindergarten.  (2017 Tr. at 161).  Of the Children, R.D. currently is in the second half of the fourth grade and soon will be ten (10) years old.

The APS Bus Stop Safety Procedures provide that "[t]he parent or designee must accompany their student(s) at the bus stop at drop-off and pick-up for students eight years old and younger."  ([31.1] at 22; see [6.1] ¶ 5; 2017 Tr. at 139-141).[47]  This policy does not require adult supervision.  APS allows children under nine (9) years old to be accompanied by an older sibling, instead of an adult, when being picked up or dropped off at a bus stop.  ([6.1] ¶ 5).  The policy also

---

[46]     Ms. Todd's argument would mean that all children under nine (9) years old, who walk to school without adult supervision, are neglected by their parents.

[47]     Taking Ms. Todd's argument to its conclusion, she would contend that APS is required to walk her Children to the bus stop.  Even assuming a bus stop was established in Plaintiffs' neighborhood, the Children, like other students at Continental Colony, "could be required to walk up to ¼ mile to the nearest bus stop."  ([31.1] at 22).  This is almost as far as the distance from Plaintiffs' home to the school.

requires supervision only "at the bus stop [for] drop-off and pick-up," a context in which heightened caution may be warranted in light of liability concerns and "specific statutory regulations" about school bus safety.  Cawthon v. Waco Fire & Cas. Ins. Co., 358 S.E.2d 615, 617 (Ga. Ct. App. 1987); see O.C.G.A. §§ 40-6-160 et seq.[48]  The APS Bus Stop Safety Procedures do not require a parent to walk their children to and from the bus stop, and do not address the age at which children may walk to school unaccompanied by an adult.  (See [6.1] ¶ 5; 2017 Tr. at 130). The evidence in this case does not show that the Children cannot reasonably walk to school without adult supervision.

"[W]hen an individual already has meaningful access to a benefit to which he or she is entitled, no additional accommodation, reasonable or not, need be provided by the governmental entity."  Medina, 72 F. Supp. 3d at 1278 (citation and internal quotation marks omitted).  The Court finds that Ms. Todd has not proved by a preponderance of the evidence that she was denied a benefit to which she is entitled and has not proved an accommodation was required.  Defendants are not required to accommodate Ms. Todd's blindness because it does not prevent her

---

[48]     For example, O.C.G.A. § 40-6-164 provides that "[a]fter stopping to allow children to disembark from the bus, it shall be unlawful for the driver of the school bus to proceed until all children who need to cross the roadway have done so safely."

Children from receiving an education at Continental Colony.  An accommodation is not necessary to ensure Ms. Todd's receipt of the public benefit to which she claims she is entitled.  Cf. Owens v. Sec'y, Fla. Dep't of Corr., 602 F. App'x 475, 479 (11th Cir. 2015) (dismissing an ADA claim because "no reasonable modification was necessary to avoid discrimination against [plaintiff] on the basis of a disability").  The Children's prior absences from school are not due to Ms. Todd's blindness but to her intense, personal anxiety about the safety of her Children walking to school alone or with others.  Defendants are not required to accommodate this anxiety because Plaintiffs do not argue, and the evidence does not suggest, that it is a disability.  (See 2017 Tr. at 15).[49]

C.     Whether Defendants Provided a Reasonable Accommodation for Ms. Todd's Disability

Even though an accommodation is not required here, the Court considers whether APS addressed Ms. Todd's concerns by offering reasonable, effective assistance in getting the Children to and from school.  The Court evaluates this assistance under the standards used to determine whether a person's disability has been reasonably accommodated.

---

[49]     Plaintiffs do not contend that Ms. Todd suffers from a mental health disability.  (2017 Tr. at 15).  Ms. Todd's only alleged disability is blindness.  (2017 Tr. at 15).

1.  Legal Principles

The reasonable accommodation inquiry "is a highly fact-specific inquiry."
Bircoll, 480 F.3d at 1085.  "[A] reasonable accommodation need not be perfect or
the one most strongly preferred by the plaintiff. . . ."  Wright, 831 F.3d at 72
(citations, alterations, and internal quotation marks omitted).  It must be "effective"
and provide the disabled plaintiff with "meaningful access" to the benefit she
seeks.  Id.; Choate, 469 U.S. at 301; Medina, 72 F. Supp. 3d at 1278.
"[M]eaningful access does not mean equal access or preferential treatment."
Medina, 72 F. Supp. 3d at 1279 (citation, alterations, and internal quotation marks
omitted).[50]  "The plaintiff has the burden of proving that [a requested]
accommodation is reasonable."  Shannon v. Postmaster Gen. of U.S. Postal Serv.,
335 F. App'x 21, 25 (11th Cir. 2009).

2.  Analysis

The Court first considers what a reasonable accommodation looks like given
the specific facts in this case.  That is, under the fact-intensive inquiry required,
what would enable the Children to attend school, assuming they cannot walk there

---

[50]    For example, "a wheelchair bound student who requires a ramp to access the
doors of school will never enter school in the same way as his non-disabled
counterpart[.]"  A.M. ex rel. J.M. v. NYC Dep't of Educ., 840 F. Supp. 2d 660,
681 (E.D.N.Y. 2012), aff'd sub nom. Moody ex rel. J.M. v. NYC Dep't of Educ.,
513 F. App'x 95 (2d Cir. 2013).

themselves?  The solution must be suitable for families, including parents of students, in a single family residential environment.  A reasonable solution may involve identifying other students—ideally neighborhood children—who are willing to walk with the Children to school.  Another reasonable solution may involve asking a parent in the neighborhood to allow the Children to ride with them and their children to school.  These proposals may well be the perfect accommodations and, even if they are not, they provide a safe, customary means of access to a neighborhood school.  Defendants offered both of these proposals to Ms. Todd.  She rejected them.

Defendants offered to coordinate a walking group comprised of at least two other students, in the fourth or fifth grade, who would walk Ms. Todd's Children to and from school.  Franklin agreed to accompany this walking group, during its initial stages, to help the students become acquainted.  Defendants also identified a community member, Wallace, who is willing to drive Ms. Todd's Children to and from school.[51]  Wallace drives his own child to school each day and offered to allow Ms. Todd's Children to ride with them.  APS, because of Ms. Todd's distrust

---

[51]    Although Wallace is not currently reachable at the telephone number that APS provided to Plaintiffs, Defendants represented to the Court that a community member has offered to drive Ms. Todd's children to and from school.  (2017 Tr. at 63, 86-87; see [33] at 16-17; [34.3]).

of others, even offered to conduct a background check on Wallace.  These measures reasonably would enable the Children to attend Continental Colony.

Ms. Todd rejected both proposals on the grounds that they are unsafe and unreliable.  She takes the position that an APS official must provide the Children with door-to-door transportation to and from Continental Colony.  Tellingly, Ms. Todd's safety concern is not even implicated by the proposed arrangement involving Wallace.  Ms. Todd could walk her Children to school by herself, and then ride home with Wallace.  She could then ride to school with Wallace and walk her Children home by herself.  This arrangement does not implicate Ms. Todd's safety concerns because it does not involve any contact between her Children and third parties.[52]  Even if it did, APS has offered to run a background check on Wallace, which reasonably addresses Ms. Todd's safety concerns.  Ms. Todd repeatedly suggested, at the 2017 hearing, that background checks are an effective way to address safety concerns.  (See 2017 Tr. at 30, 33, 68).

Franklin also has offered to accompany the walking group, during its initial stages, to and from school.  This would help the Children learn, in a safe environment, how to navigate the walking path responsibly.  The Children already

---

[52]   Ms. Todd could, as an alternative, potentially ride in the vehicle with Wallace and her Children to personally monitor their safety.

have significant experience in navigating Plaintiffs' street because they routinely

walk to the grocery store with their mother or their fourteen-year-old brother, D.D.

It is a small step from walking with D.D., to walking in a group with other children

as do other students in the neighborhood.  Ms. Todd has not shown the Children

are unable to take this step safely.

Ms. Todd's claimed safety concerns are not credible or reasonable

considering that she has repeatedly permitted her children to ride with strangers or

community members.  She previously allowed Five Star drivers, whom she did not

know, to transport her Children to and from school.  Ms. Todd testified, at the 2017

hearing, that she did not even know the full name of the Five Star driver who drove

her Children home from school from October 17, 2016, through December 2016.

(2017 Tr. at 61-62).  Ms. Todd nonetheless testified that she was "comfortable"

with this arrangement.  (2017 Tr. at 81).  She currently allows two community

members to drive her Children to and from school.  ([34.1]).  She allows her

fourteen-year-old son to be driven to the store by his friend's mother.  (2017 Tr. at

39).  Ms. Todd testified that she cannot trust a person unless she spends time with

them, but she has refused to meet with Wallace or other community members who

may, in the future, volunteer their assistance.  (2017 Tr. at 75-76).

Defendants' proposed assistance also provides the Children with reasonably reliable access to Continental Colony, including because Wallace drives his own child to and from school each day, and the proposed walking group includes other students who are required to attend school on the same days as Ms. Todd's Children.  If Wallace and the walking group are unable to take Ms. Todd's Children to or from school on a certain day—circumstances faced by every parent, including those who work full-time and rely on others to get their children to school, and those who have occasional personal emergencies or are out of town— Ms. Todd could reasonably seek intermittent help from others in her network. These include Dennison, the father of D.D., R.D. and R.D.; Ms. Todd's aunt, who currently visits her once a week; Julius Varner, who drives Ms. Todd to and from church; Ms. Todd's "little big brother," Cory, who said he can drive the Children to school in the mornings; Ms. Todd's longtime and "really close friend[]," Eshkia Michelle Thomas, who drove Ms. Todd to Humphries Elementary School in 2014; and the two community members who are currently driving Ms. Todd's Children to and from Continental Colony.  (See 2016 Tr. at 17; 2017 Tr. at 40-43, 118-119; [34.1]); cf. Ganstine, 502 F. App'x at 910 (dismissing a Title II action because the

plaintiff-inmate, who claimed he could not access areas of the prison in his wheelchair, could go wherever he needed to go "most of the time").[53]

Ms. Todd demands that her Children receive daily transportation from an APS official whom she personally trusts after "feel[ing] [their] soul." (2017 Tr. at 71-72, 83-85). She testified that if she did not trust the APS official after screening him, she would demand a substitute official. (2017 Tr. at 72). Even if APS provided a bus, she testified at the evidentiary hearing that she would have to hug the driver to feel his soul, and if she did not trust the driver after conducting this evaluation, she would demand a different bus driver to transport her Children. Ms. Todd's method for evaluating whether to entrust her Children to another person is not rational. That Ms. Todd demands that all of her Children be provided door-to-door transportation, regardless of their age, and even though other children of the same age walk to Continental School, underscores her unreasonableness.

APS is not required to provide the Children with a bus driver—or an APS escort—of Ms. Todd's choice. "The purpose of the [ADA] is to place those

---

[53]    Ms. Todd testified that she is unwilling to accept a community-based arrangement to get her Children to and from school, because she "do[es] not want five people at my door every other day" or to "deal with different people." (2017 Tr. at 80-81). She testified "I didn't want it when I can see and I don't want it now." (2017 Tr. at 81). This underscores that Ms. Todd's intractable unwillingness to engage with, or accept help from, community members predates her blindness.

with disabilities on an equal footing, not to give them an unfair advantage."
Kornblau, 86 F.3d at 194.  Although Defendants' proposed accommodations are
not "the ones most strongly preferred by the plaintiff," they are reasonable, if not
eminently so, because they allow Ms. Todd's Children to "effective[ly]" access
their school.  Wright, 831 F.3d at 72; see Stewart v. Happy Herman's Cheshire
Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997) ("[U]nder the ADA a qualified
individual with a disability is not entitled to the accommodation of her choice, but
only to a reasonable accommodation." (internal quotation marks omitted));
Medina, 72 F. Supp. 3d at 1279 ("[T]he ADA entitles disabled persons to
reasonable accommodations, not to optimal ones finely tuned to their preferences."
(citation, alterations, and internal quotation marks omitted)).  While there are likely
other accommodations that could be offered, the record here is clear that any
further offer would be futile.  Ms. Todd has made clear her demands—as
unreasonable and unbending as they are.  To offer any other would be
unproductive in light of her demands and her basis for making them.

Ms. Todd's disability does not prevent her Children from attending school.
Ms. Todd has not proved by a preponderance of the evidence that she requested
and was denied a reasonable accommodation, assuming that one was required.
Defendants offered reasonable, safe and effective means to assist the Children to

51

get to school and return home.  Ms. Todd has not proved her Title II claim and she is not entitled to injunctive relief.

## VI.    THE CHILDREN'S ASSOCIATIONAL DISCRIMINATION CLAIM

Plaintiffs R.D., R.D. and D.T., who are not disabled, claim that Defendants' failure to accommodate Ms. Todd's blindness impermissibly denied them access to school because of their association with a disabled person.  (See, e.g., Compl. ¶¶ 74, 76, 91).  The Children assert this claim under 28 C.F.R. § 35.130(g), a regulation promulgated pursuant to Title II of the ADA.  The Children also assert their claim under section 504 of the Rehabilitation Act.  The Court first determines that associational discrimination claims are not cognizable under Title II of the ADA or, in this case, under section 504 of the Rehabilitation.  Even if they were, the Children's claims fail for the same reasons that Ms. Todd is not entitled to relief—Ms. Todd's blindness does not prevent the Children from attending school and, even if it did, Defendants have provided reasonable accommodations.

### A.    Whether Associational Discrimination Claims are Viable under Title II of the ADA

28 C.F.R. § 35.130(g) provides that "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."  28 C.F.R. § 35.130(g).  This

52

regulation purports to prohibit discrimination against *nondisabled* individuals

because of their relationship with a disabled person.  See Tugg v. Towey, 864

F. Supp. 1201, 1208 (S.D. Fla. 1994) (stating that the regulation "grant[s] an

independent right of action to individuals who are not disabled but are

discriminated against"); Nondiscrimination on the Basis of Disability in State and

Local Government Services, 1991 WL 304268, 56 FR 35694-01, at 35706

(July 26, 1991) ("Section 35.130 Appendix") ("The individuals covered under

[section 35.130(g)] are any individuals who are discriminated against because of

their known association with an individual with a disability.").

　　　28 C.F.R. § 35.130(g) is based on Title II of the ADA, which prohibits

discrimination against "individual[s] with a disability."  42 U.S.C. § 12132.  "[T]he

regulatory text is broader than the statutory text; the regulation protects not only

'qualified individual[s] with . . . disabilit[ies],' but also *other* individuals and

entities who have a known 'relationship or association' with an individual with a

disability."  Friends of Trumbull v. Chicago Bd. of Educ., 123 F. Supp. 3d 990,

997 (N.D. Ill. 2015).  Given this discrepancy, the Court first considers whether the

regulation is entitled to deference under Chevron, U.S.A., Inc. v. Natural Res. Def.

Council, Inc., 467 U.S. 837 (1984).

1.    The Chevron Framework

The United States Supreme Court in <u>Chevron</u> provided for deference to certain government regulations promulgated under a federal statute.  The court in <u>Chevron</u> stated:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

<u>Chevron</u>, 467 U.S. at 842-43.

This framework is "rooted in a background presumption of congressional intent:  namely, that Congress, when it left ambiguity in a statute administered by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows."  <u>City of Arlington v. F.C.C.</u>, 133 S. Ct. 1863, 1868 (2013) (internal quotation marks omitted).  "<u>Chevron</u> thus provides a stable background rule against which Congress can legislate:  Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by

54

the courts but by the administering agency." Id.  "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." Id.

"If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Chevron, 467 U.S. at 843 n.9.  Clear statutory language "remov[es] the interpretation of the statutory provision from the agency's discretion." Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of Health & Human Servs., 468 F.3d 1347, 1351 (11th Cir. 2006).  "Only if the statute is silent or ambiguous with respect to the specific issue will [courts] proceed to Chevron's second step and ask whether the agency's interpretation is based on a permissible construction of the statute." Id. (citation and internal quotation marks omitted).

"A permissible construction of the statute is one which is reasonable in light of the language, policies, and legislative history of the statute." United States v. Bd. of Trustees for Univ. of Alabama, 908 F.2d 740, 746 (11th Cir. 1990).  "This is a highly deferential standard.  To uphold the agency's interpretation of a statute, a court need not conclude that the agency's interpretation is the best interpretation, or the most natural one—but simply that it is permissible." Alboniga v. Sch. Bd. of Broward Cty. Fla., 87 F. Supp. 3d 1319,

1334 (S.D. Fla. 2015) (citations and internal quotation marks omitted); see Shotz, 344 F.3d at 1179 (stating that regulations are "entitled to controlling weight unless they are procedurally flawed, substantively arbitrary and capricious, or plainly contradict the statute").

### 2.   Chevron and 28 C.F.R. § 35.130(g)

Several courts have addressed associational discrimination claims asserted under Title II.  See, e.g., A Helping Hand, 515 F.3d at 362-64; MX Grp., Inc. v. City of Covington, 293 F.3d 326, 332-35 (6th Cir. 2002); Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 46-48 (2d Cir. 1997).  The Eleventh Circuit, however, has not addressed whether Chevron requires deference to 28 C.F.R. § 35.130(g) where Title II, unlike Titles I and III, does not expressly prohibit associational discrimination.  The Court uses "traditional tools of statutory construction" to determine whether Congress "directly spoke[] to the precise question at issue," namely, whether Title II of the ADA prohibits associational discrimination.  Chevron, 467 U.S. at 842-43 & n.9.

"[T]he starting point for interpreting a statute is the language of the statute itself."  Montgomery Cty. Comm'n v. Fed. Hous. Fin. Agency, 776 F.3d 1247, 1255 (11th Cir. 2015) (internal quotation marks omitted) (quoting Gwaltney of Smithfield, Ltd. v. Chesapeake, 484 U.S. 49, 57 (1987)).  The Court must apply the

plain meaning of the statutory language unless doing so leads to an absurd result.

See Sebelius v. Cloer, 133 S. Ct. 1886, 1896 (2013) ("[W]hen a statute's language

is plain, the sole function of the courts—at least where the disposition required by

the text is not absurd—is to enforce it according to its terms." (internal quotation

marks omitted) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank,

N.A., 530 U.S. 1, 6 (2000))).  "[R]eference to legislative history is inappropriate

when the text of the statute is unambiguous."  Dep't of Hous. & Urban

Dev. v. Rucker, 535 U.S. 125, 132-33 (2002); see Wachovia Bank, N.A. v. United

States, 455 F.3d 1261, 1267 (11th Cir. 2006) ("If the meaning of the statutory

language in context is plain, we go no further.").  "Only when a statute's meaning

is 'inescapably ambiguous,' will this Court turn to legislative history to aid in

interpretation."  United States v. Williams, 790 F.3d 1240, 1245 (11th Cir. 2015)

(quoting United States v. Veal, 153 F.3d 1233, 1245 (11th Cir. 1998)).  "Statutory

language is ambiguous if it is susceptible to more than one reasonable

interpretation."  Med. Transp. Mgmt. Corp. v. Comm'r of I.R.S., 506 F.3d 1364,

1368 (11th Cir. 2007).

Section 12132 of the ADA provides that "no qualified *individual with a*

*disability* shall, by reason of such disability, be excluded from participation in or

be denied the benefits of the services, programs, or activities of a public entity, or

be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (emphasis

added).  "The term 'qualified individual with a disability' means *an individual with*

*a disability* who, with or without reasonable modifications . . . , meets the essential

eligibility requirements for the receipt of services or the participation in programs

or activities provided by a public entity."  42 U.S.C. § 12131(2) (emphasis added).

The plain language of these provisions prohibits discrimination only against

"individual[s] with a disability."  Id.; see Shotz, 256 F.3d at 1079 (noting that "[t]o

state a claim under Title II of the ADA, a plaintiff must allege . . . that he is a

'qualified individual with a disability.'").[54]

Titles I and III expressly prohibit, in the employment and public

accommodation contexts, discrimination against nondisabled individuals "because

of the known disability of an individual with whom the qualified individual is

known to have a relationship or association."  42 U.S.C. § 12112(b)(4); 42 U.S.C.

---

[54]     Section 12133 makes available certain "remedies, procedures, and rights" to
"any person alleging discrimination on the basis of disability in violation of section
12132 of this title."  42 U.S.C. § 12133.  Even interpreting this provision broadly,
it still requires a "violation of section 12132," which requires discrimination
against a disabled person.  Id.; see Kessler Inst. for Rehab., Inc. v. Mayor &
Council of Borough of Essex Fells, 876 F. Supp. 641, 653 (D.N.J. 1995) ("Both
42 U.S.C. § 12132, which confers a substantive right to be free from discrimination
in the provision of public services, and 42 U.S.C. § 12133, the enforcement
provision (which incorporates 29 U.S.C. § 794 by reference), are limited to
'qualified individual(s) with a disability'. . . .  Subchapter II of the ADA confers no
substantive rights upon [nondisabled individuals].").

§ 12182(b)(1)(E).[55]  That Title II does not include this enlarging language supports

Congressional intent to omit associational discrimination claims from Title II.

"[W]here Congress knows how to say something but chooses not to, its silence is

controlling."  <u>CBS Inc. v. PrimeTime 24 Joint Venture</u>, 245 F.3d 1217, 1226 (11th

Cir. 2001) (citation and internal quotation marks omitted); <u>see Sebelius</u>, 133 S. Ct.

at 1894 ("[W]here Congress includes particular language in one section of a statute

but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion."

(internal quotation marks omitted) (quoting <u>Bates v. United States</u>, 522 U.S. 23,

29-30 (1997))); <u>Hamdan v. Rumsfeld</u>, 548 U.S. 557, 578 (2006) ("A familiar

principle of statutory construction . . . is that a negative inference may be drawn

---

[55]     Title I states that "[n]o covered entity shall discriminate against a qualified
individual on the basis of disability. . . ."  42 U.S.C. § 12112(a).  It defines this
phrase to prohibit "excluding or otherwise denying equal jobs or benefits to a
qualified individual because of the known disability of an individual with whom
the qualified individual is known to have a relationship or association."  42 U.S.C.
§ 12112(b)(4).  The text makes clear that the "qualified individual," without a
disability, must not be discriminated against because of his associate's disability.
Title II, in contrast, prohibits discrimination only against "individual[s] with a
disability."
        Title III states "[n]o individual shall be discriminated against on the basis of
disability."  42 U.S.C. § 12182(a).  Title III states further "[i]t shall be
discriminatory to exclude or otherwise deny equal goods, services, facilities,
privileges, advantages, accommodations, or other opportunities to an individual or
entity because of the known disability of an individual with whom the individual or
entity is known to have a relationship or association."  42 U.S.C. § 12182(b)(1)(E).

from the exclusion of language from one statutory provision that is included in other provisions of the same statute.").[56]

Applying the admonition in <u>Chevron</u> that the matter of what a statute requires is at an end if Congressional intent is clear in light of the "traditional tools of statutory construction," 467 U.S. at 843 n.9, the Court finds that Title II protects only "individual[s] with a disability," 42 U.S.C. § 12132.  To the extent 28 C.F.R. § 35.130(g) provides a cause of action for discrimination against nondisabled individuals, it "plainly contradict[s] the statute" and is not enforceable.  <u>Shotz</u>, 344 F.3d at 1179; <u>see</u> <u>United States v. Dierckman</u>, 201 F.3d 915, 923 (7th Cir. 2000) ("[I]f the plain meaning of the text of the statute either supports or opposes the regulation, the inquiry ends, and this court applies the statute's plain meaning." (citation and internal quotation marks omitted)); <u>cf.</u> <u>Noel v. N.Y. City Taxi & Limousine Comm'n</u>, 687 F.3d 63, 68 (2d Cir. 2012) ("Although the ADA is to be interpreted broadly, the scope of Title II is not limitless." (citation and internal

---

[56]     The ADA's findings and purposes are consistent with this conclusion because they refer only to discrimination against disabled individuals or against individuals "who have a record of a disability or are regarded as having a disability."  <u>See</u> 42 U.S.C. § 12101.

quotation marks omitted)).  The Children's associational discrimination claims are

not cognizable under Title II of the ADA.[57]

---

[57]     Other courts have hinted, without deciding, that 28 C.F.R. § 35.130(g) may exceed the scope of the ADA provision on which it is based.  See, e.g., Friends of Trumbull, 123 F. Supp. 3d at 997 (explaining that "the regulatory text [of 28 C.F.R. § 35.130(g)] is broader than the statutory text [of section 12132]," and stating there is "no authority . . . that a plaintiff who falls outside the zone of interests based on the *statutory* language can be pulled back within the zone based on a *regulation's* text"); Glass v. Hillsboro Sch. Dist. 1J, 142 F. Supp. 2d 1286, 1288 n.3 (D. Or. 2001) (declining to address whether associational discrimination claims are available under Title II, and noting that Titles I and III, but not Title II, expressly include associational discrimination provisions).  After noting that the argument against the validity of the regulation is "persuasive[]," the Second Circuit stated, in dicta, that the regulation is not "manifestly contrary to Title II's general discrimination prohibition" and that it is entitled to Chevron deference. Innovative Health, 117 F.3d at 47.  The Second Circuit relied on legislative history, including statements from the House Committee on Education and Labor, to reach this conclusion.  This Court respectfully disagrees with the Second Circuit's dicta. The Court is not permitted to consult legislative history because the meaning of section 12132 is unambiguous.  See Barnhill v. Johnson, 503 U.S. 393, 401 (1992) ("[W]e note that appeals to statutory history are well taken only to resolve statutory ambiguity." (citation and internal quotation marks omitted)); Mamani v. Berzain, 825 F.3d 1304, 1311 (11th Cir. 2016) ("Because the plain language is decisive, we will not resort to . . . legislative history.  Nor will we entertain the defendants' attempts to use the legislative history to manufacture ambiguity in the text." (internal quotation marks omitted)).  "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 167 (2004) (citation and internal quotation marks omitted).

B.     Whether Associational Discrimination Claims are Viable under the
       Rehabilitation Act

The Children also assert their associational discrimination claims under

section 504 of the Rehabilitation Act.  That provision states:  "No otherwise

qualified individual with a disability . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal

financial assistance . . . ."  29 U.S.C. § 794(a).  Like Title II of the ADA, the plain

language of this provision prohibits discrimination only against "individual[s] with

a disability."  Id.[58]

Courts in our Circuit have allowed associational discrimination claims under

the Rehabilitation Act where the allegedly discriminatory conduct fell under Title I

(employment) or Title III (public accommodation) of the ADA.  See, e.g.,

McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1142-43 (11th

Cir. 2014) (describing the standard for associational discrimination claims under

---

[58]     The Rehabilitation Act makes available certain "remedies, procedures, and
rights . . . to any person aggrieved by any act or failure to act . . . under section 794
of this title."  29 U.S.C. § 794a(a)(2).  Even construing this provision broadly, it
still requires a violation of section 794, which requires discrimination against a
disabled person.  To the extent "any person aggrieved" by a violation of
section 794 has standing to sue, this does not alter the conduct for which the
aggrieved person may sue—namely, discrimination against "qualified individual[s]
with a disability."

the Rehabilitation Act where the allegedly discriminatory conduct fell within

Title III); Whitfield v. Hart Cty., Ga., No. 3:13-cv-114, 2015 WL 1525187, at *9

(M.D. Ga. Apr. 3, 2015) ("[C]ourts have recognized that an employee can sue

under the Rehabilitation Act when her employer discriminates against her due to

her association with a disabled person.").  That courts have allowed associational

discrimination claims under the Rehabilitation Act in the context of Titles I and III

is consistent with cases stating that claims under the Rehabilitation Act mirror

those under the specific provision of the ADA at issue.  Titles I and III explicitly

prohibit associational discrimination, and "the same standards govern

discrimination claims under the Rehabilitation Act and the ADA."  Allmond, 558

F.3d at 1316 n.3; see McCullum, 768 F.3d at 1143 (using the standard for

associational discrimination under Title III to define the standard under the

Rehabilitation Act, because the ADA "express[ly] direct[s] that we must not

construe that statute to apply a lesser standard than the standards that apply under

the RA").  Indeed, section 504 of the Rehabilitation Act states expressly that "[t]he

standards used to determine whether this section has been violated in a complaint

alleging employment discrimination . . . shall be the standards applied under title I

of the Americans with Disabilities Act of 1990."  29 U.S.C. § 794(d); see

Walthall v. Fulton Cty. Sch. Dist., 18 F. Supp. 2d 1378, 1386 (N.D. Ga. 1998)

(relying on section 794(d) to apply the Title I associational discrimination standard to a Rehabilitation Act claim).

The Eleventh Circuit has not addressed the viability of Title II associational discrimination claims under the Rehabilitation Act. The Court, applying the plain language of the statute, finds that the Rehabilitation Act does not protect nondisabled individuals from discrimination in the Title II context.[59] The Children's associational discrimination claims fail because they are not cognizable under Title II of the ADA or Section 504 of the Rehabilitation Act.

C.   <u>Whether the Children have Established Actionable Discrimination, Assuming Associational Discrimination Claims Exist under Title II</u>

Associational discrimination claims are constrained even under Titles I and III where they are allowed. The Eleventh Circuit has stated: "non-disabled persons have standing to seek relief under either [Title III or the Rehabilitation Act] only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person." <u>McCullum</u>, 768 F.3d at 1143. This is in line with the specific examples of associational discrimination set out in the appendix to 28 C.F.R. § 35.130(g) and in the Department of Justice's ("DOJ") guidance over the scope of

---

[59]   The Court respectfully disagrees with courts that have reached a contrary conclusion. <u>Cf.</u> <u>MX Grp.</u>, 293 F.3d at 333-335.

the regulation.  The appendix states "it would be a violation of [section 35.130(g)] for a local government to refuse to allow a theater company to use a school auditorium on the grounds that the company had recently performed for an audience of individuals with HIV disease."  Section 35.130 Appendix, at 35706. The DOJ's guidance states:  "If a county-owned sports arena refuses to admit G, an individual with cerebral palsy, as well as H (his sister) because G has cerebral palsy, the arena would be illegally discriminating against H on the basis of her association with G."  Department of Justice, The Americans with Disabilities Act: Title II Technical Assistance Manual, at II-3.9000, https://www.ada.gov/taman2.html#II-3.9000 ("Title II TA Manual"); see also Section 35.130 Appendix, at 35706.  The DOJ's guidance also provides that "[a] county recreation center may not refuse admission to a summer camp program to a child whose brother has HIV disease."  Title II TA Manual, at II-3.9000.

Even if associational discrimination claims were available under Title II or the Rehabilitation Act, the Children have failed to establish they were discriminated against because of Ms. Todd's disability.  The walk zone was put into place before Ms. Todd and the Children moved to their home on The Fontainebleau SW.  There simply was no discrimination against the Children in enacting the walk zone and in the failure to provide them with transportation.

Ms. Todd's disability does not even prevent the Children from accessing the public benefit they seek, namely, an education at Continental Colony.  Even if it did, Defendants have offered reasonable, safe assistance and aid to Ms. Todd so that the Children can attend school.  Ms. Todd has refused every accommodation offered and will not take steps to evaluate those that are.  This blanket refusal is unreasonable, and the reasons for the refusal are not rational.  The Children have not established an ADA violation, and they are not entitled to injunctive relief.[60, 61]

---

[60]    Plaintiffs also claim that APS's transportation policy "utilize[s] criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," in violation of 28 C.F.R. § 35.130(b)(3)(i).  (See [3.1] at 17; [33] at 32-33).  To the extent this constitutes an independent claim, it was not clearly asserted in Plaintiffs' Complaint and fails because, as explained in this Order, Defendants' policy has not resulted in discrimination against Plaintiffs.  Defendants' policy is not discriminatory because APS provides transportation for disabled students and, through its Division of Student Services, identifies other solutions for students not eligible for APS transportation who have difficulty getting to school, including any non-disabled students of disabled parents.  (See, e.g., 2017 Tr. at 127-128, 148, 155; [27.1] at 60; see also [26.1] at 9 ("[W]hatever barriers it is that causes the child not to come to school, . . . one of [the school social worker's] jobs is to undo that barrier.")).

[61]    Because Plaintiffs have not shown that Defendants violated the ADA, their Rehabilitation Act claims necessarily fail.  See Atchison v. Bd. of Regents of the Univ. Sys. of Ga., No. 1:13-cv-02922, 2014 WL 12013430, at *5 (N.D. Ga. Nov. 13, 2014) ("Because he fails to state [a] claim for discrimination under Title II, [plaintiff] necessarily falls short of the even higher standard imposed by the Rehabilitation Act.").

## VII.   REMAINING REQUIREMENTS FOR A PERMANENT INJUNCTION

A party seeking a permanent injunction must establish actual success on the merits, irreparable harm in the absence of an injunction, and an inadequate remedy at law.  U.S. Army Corps of Engineers, 424 F.3d at 1128.  For the reasons stated in this Order, Plaintiffs have not established actual success on the merits of their ADA claims.[62]  Having failed to show that the Children are being denied an education, Plaintiffs necessarily have failed to establish that any harm, irreparable or otherwise, would result in the absence of an injunction.  Plaintiffs also fail to show they lack an adequate remedy at law, because they have not established a violation that requires a remedy.  Plaintiffs are not entitled to injunctive relief because they have not satisfied any of the requirements for a permanent injunction.

## VIII.  FINAL OBSERVATION

The Court offers this final observation.  Ms. Todd is a caring and compassionate mother.  It is undisputed that she loves her children and is challenged by her disability.  Being a parent requires effort, reason and

---

[62]     Because Plaintiffs fail to meet the first part of the test for injunctive relief, the Court need not address whether Plaintiffs have demonstrated irreparable harm or the absence of an adequate remedy at law.  See Chandler v. Georgia Pub. Telecommunications Comm'n, 917 F.2d 486, 490 (11th Cir. 1990) ("Because appellees do not meet the first part of the test for a preliminary injunction, we need not address the other elements of the test.").

selflessness—even when those things are hard.  Modeling character to children is often difficult.  Ms. Todd suffered a devastating health condition in her life.  That is clear.  In responding to it, she has the opportunity to set an example of self-sufficiency and wisdom to her children.  Doing so will impact them in immeasurable ways, including in enabling them to be independent adults and citizens.  In the end, children must be educated, empowered, and allowed to be independent so they may be released to live fulfilled lives in the world—even when that presents real or perceived risks.

## IX.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' request for permanent injunctive relief is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction [3] is **DENIED**.

**SO ORDERED** this 17th day of February, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE